United States District Court
Southern District of Texas
FILED

JUN 2 1 2004

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| DIRECTV, Inc., | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **No. CIV. B-03-194** |
| | § | |
| AARON VOREIS | § | |
| **Defendant.** | § | |

## PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT AARON VOREIS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, MOTION FOR A RULE 56(f) CONTINUANCE TO CONDUCT DISCOVERY

Plaintiff DIRECTV, Inc. ("Plaintiff" or "DIRECTV") files this Response and Brief in Opposition to Defendant Aaron Voreis' ("Defendant" of "Voreis") Motion for Summary Judgment ("Response"), or in the alternative, Motion for a Rule 56(f) Continuance to Conduct Discovery. In support thereof, DIRECTV shows as follows.

### I. INTRODUCTION

DIRECTV filed the instant action against Defendant in connection with his illegal interception of DIRECTV's satellite programming and has asserted claims for common law conversion and for violations of the Cable Communications Policy Act of 1984, 47 U.S.C. § 521, *et seq.*, the Electronic Communications Policy Act, 18 U.S.C. § 2511, *et seq.* and section 123 of the Tex. Civ. Prac. & Rem. Code. In this case, DIRECTV seeks legal and equitable relief from the Defendant.

On or about May 20, 2004, *before any discovery had been taken in this case,* Defendant filed a Motion for Summary Judgment (the "Motion") that seeks dismissal of each of Plaintiff's claims identified above.[1] As the sole evidentiary support for his Motion, Defendant has proffered his own affidavit in which he does not deny purchasing the devices or that the devices were addressed and shipped to him. *See* Affidavit of Aaron Voreis (the "Voreis Aff."), attached to his Motion as Exhibit B. Rather, Defendant's entire Motion can be reduced to this simple proposition: because there is no direct evidence of

---

[1] Plaintiff will agree to voluntarily dismiss its claims under 18 U.S.C. § 2512 and for civil conversion. Accordingly, DIRECTV's Response is not directed to Defendant's challenges to those claims.

actual interception of DIRECTV's signal, then Plaintiff's claims must fail as a matter of law.[2]

Plaintiff, however, brings forth competent summary judgment evidence in this Response that shows, or at least raises an inference, that Defendant *did* intercept or attempt to intercept DIRECTV's satellite programming. Accordingly, and as fully set forth below, Defendant's Motion should be denied in its entirety.

Summary Judgment Evidence

DIRECTV intends to use the following evidence in this Response:

**Exhibit A** – Affidavit of James F. Whalen (the "Whalen Aff.")

**Exhibit B** – Affidavit of Bill Gatliff (the "Gatliff Aff.")

**Exhibit C** – Affidavit of Carol Fong-Hilton (the "Fong-Hilton Aff.")

**Exhibit D** – Affidavit of Li Sang regarding purchase records of Voreis.

## II. DIRECTV'S ARGUMENTS AND AUTHORITIES IN OPPOSITION TO THE MOTION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also* Christopher Village, LP v. Retsinas, 190 F.3d 310, 314 (5th Cir. 1999). When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See* Samuel v. Holmes, 138 F.3d 173, 176 (5th Cir. 1998); Texas v. Thompson, 70 F.3d 390, 392 (5th Cir. 1995). Summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case only after

---

[2] Based on lack of evidence of interception, Defendant seeks dismissal of DIRECTV's claims under 47 U.S.C. § 605 *et seq.*, 18 U.S.C. 2510 *et seq.* and TEX. CIV. PRAC. & REM. CODE § 123 *et. seq.* It should be noted, however, that neither 47 U.S.C. § 605(e)(4) nor TEX. CIV. PRAC. & REM. CODE § 123.001 *et. seq.* requires that DIRECTV demonstrate actual interception of its signal. Section § 605(e)(4) permits DIRECTV to pursue defendants who have, among other things, modified, distributed, assembled or transported illegal devices. See DIRECTV v. Boonstra 2004 U.S. Dist. Lexis 1807, *16 (W.D. Mich. Feb. 2, 2004) and United States v. Harrell 983 F.2d 36, 39 (5th Cir. 1993)
Further, TEX. CIV. PRAC. & REM. CODE 123.002(a)(1) permits DIRECTV to pursue a defendant who "attempts to intercept" its programming.

an adequate time for discovery. *See* Celotex v. Catrett, 477 U.S. 317, 322-23 (1986); Wright v. Mitchell, 2001 U.S. Dist. Lexis 4007 (N.D. Tex. March 1, 2001). Further, a motion for summary judgment is properly granted only when the facts and inferences point so strongly in favor of the movant that a rational jury could not arrive at a contrary verdict. Waymire v. Harris County, Texas, 86 F.3d 424, 427 (5th Cir. 1996).

### B. STATEMENT OF FACTS AND PRESENTATION OF EVIDENCE CREATING A GENUINE ISSUE OF MATERIAL FACT

#### DIRECTV's Satellite Programming and Conditional Access System

DIRECTV is the nation's leading direct broadcast satellite system, delivering over 225 channels of television and other programming to more than 12 million homes and businesses in the United States. *Exhibit A, p. 1*. DIRECTV encrypts – electronically scrambles – its satellite transmissions to provide security for and prevent unauthorized viewing of its satellite television programming. *Id., p. 2*. DIRECTV offers its television programming to residential and business customers on a subscription and pay-per-view basis only. *Id*. Each customer is required to obtain from DIRECTV a DIRECTV Access Card ("Access Card") and other system hardware: a small satellite dish, a DIRECTV receiver, and cabling to connect these components. *Id*.

Upon activation of the Access Card by DIRECTV, the customer can receive and view those channels to which the customer has subscribed or otherwise made arrangement to purchase from DIRECTV. *Id*. On occasion, DIRECTV sends out certain signals in order to combat the use of unauthorized Access Cards. These signals, known as Electronic Counter Measures ("ECMs"), locate illegally modified cards and disable them electronically so they can no longer receive DIRECTV programming for free. *Id., p. 6*.

#### Raids on DSSPRO and the Computer Shanty

Several individuals and companies have engaged in the manufacture and sale of illegal equipment used to circumvent DIRECTV's encryption technology. On or about November 29, 2001, DIRECTV executed Writs of Seizure with the assistance of the U.S. Marshal Service, in the matter of DIRECTV v. Derek Trone (hereinafter "Trone") et al., Civil Action No. SA CV 01-370 DOC (ANx), in the United States District Court for the Central District of California against Li Sang and his business known as Digital Source Solutions d/b/a/ DssPro (hereinafter "DSSPRO"). *Id., p. 4*. DSSPRO sold and distributed satellite

signal theft devices primarily through its websites, "www.dsspro.com," "www.dssna.com," and "www.dsszone.com." *Id.*

Further, on or about December 1, 2001, DIRECTV executed a Writ of Seizure, with the assistance of local law enforcement, at the residence of Scott Gray, who owned and operated "The Computer Shanty." *Id.* The Computer Shanty was located physically in El Paso, Texas and at times relevant to this case was an enterprise focused on distributing electronic devices primarily designed for the surreptitious interception of satellite communications broadcast by DIRECTV. *Id.*

Subsequent to those raids, DIRECTV came into possession of a substantial body of sales records, shipping records, email communications, credit card receipts and other records. *Id., p. 5.* The records obtained from raids on DSSPRO and the Computer Shanty irrefutably demonstrate Defendant Voreis' purchase of a total of eight illegal Pirate Access Devices. True and correct copies of those purchase records have been attached hereto as Exhibit D, the contents of which contain distinctive and specific characteristics relating to this particular defendant, such as his name, email, billing and shipping addresses, credit card information and telephone number.

### Plaintiff's Evidence Creates Inference of Defendant's Wrongful Interception of DIRECTV Broadcasts and Intent to Distribute the Pirate Devices

DIRECTV presents competent summary judgment evidence that (i) Defendant had created an account with DIRECTV and thus had installed in his home all of the equipment required to receive satellite programming (*see Exhibit C; Exhibit A, p. 2*); (ii) Defendant purchased a total of eight devices that are primarily used for the unlawful interception of DIRECTV's programming, and in fact, are used to ***restore functionality*** to an already illegally modified access card (*see Exhibit D; Exhibit A, pp. 5-6*); and (iii) the businesses from which Defendant purchased the devices market those products specifically for purposes of stealing DIRECTV programming (*Exhibit A, pp. 6-7*). Cumulatively, this evidence demonstrates, or at least infers, that Defendant intercepted or attempted to intercept DIRECTV programming and distributed or re-sold the devices to other end users and businesses in violation of 47 U.S.C. § 605(e)(4).

### Voreis' DIRECTV Equipment, His Multiple Devices and Their Uses

It is undisputed that Defendant owned all of the equipment necessary to receive DIRECTV satellite programming. Specifically, Defendant created his account with DIRECTV on or about November 16, 2002, at which time he received and had installed at his residence all of the equipment required to receive Plaintiff's programming, specifically a DIRECTV satellite dish, a receiver and an Access Card. *See Exhibit C; Exhibit A, p. 2.* It is further undisputed that Defendant purchased from DSSPRO and the Computer Shanty a total of eight (8) devices that are primarily used in the surreptitious interception of DIRECTV broadcasting. *See Exhibit D; Exhibit A, p. 7.*

With respect to the devices Defendant purchased and received, DIRECTV's competent summary judgment evidence demonstrates that:

- The Netsignia 210 Programmers can be used and are marketed to be used to permit the illegal programming of – writing of code to – valid DIRECTV access cards for the sole purpose of obtaining access to DIRECTV Satellite Programming without paying DIRECTV *(see Exhibit B)*;

- The "Emulator Complete with Cables" and the Shanty Blue PS2 Powered Emulator, when used with a personal computer loaded with freely available pirate software and a smart card reader/writer with a DIRECTV access card inserted, protects the pirate's DIRECTV access card from ECMs and allows the user to view all unauthorized DIRECTV programming services, including Pay-Per-View, without payment to DIRECTV *(see Exhibit B)*; and

- The Terminator Bootloader, the ISO 3 in 1 Programmer/Bootloader and the Shanty Bootloader Green are devices that are typically inserted into the user's integrated receiver and connected to a non-functional DIRECTV access card disabled by the Black Sunday ECM.[3] Bootloaders have no legitimate uses and require no additional software to intercept DIRECTV's signal *(see Exhibit B)*.

Furthermore, the sheer number of devices purchased by Defendant creates an inference that Defendant intended to distribute or did distribute the devices to other users or sellers in violation of 47 U.S.C. § 605(e)(4), since signal theft typically requires only one device. Cable Systems New York City Corp. v. Kutsenko, 2001 U.S. Dist. LEXIS 17590 at *9-10 (S.D.N.Y. October 30, 2001) ("The quantity of devices purchased by the

---

[3] On January 21, 2001 DIRECTV sent out a particularly effective ECM that caused an irreversible change to a certain component of illegally modified access cards. That ECM, referred to as "Black Sunday" by satellite pirates, was targeted at illegally modified access cards and resulted in the disabling of an unknown number of illegally modified cards that were being used to steal DIRECTV's television programming. Black Sunday was extremely effective and left a large number of satellite pirates and would-be satellite pirates without an ability to steal DIRECTV's programming. Bootloaders are designed to overcome the effects of the Black Sunday ECM.

defendant [five] is inconsistent with personal use and entirely consistent with the conduct of a distributor."), *accord* Cablevision Systems New York City Corp. v. Soto, 2001 U.S. Dist. LEXIS 17591 (S.D.N.Y. October 25, 2001); DIRECTV, Inc. v. Adkins, 2004 U.S. Dist. LEXIS 5337 (W.D. Va. April 1, 2004); Cablevision of Southern Connecticut, L.P. v. Smith, 141 F. Supp. 2d 277 (D. Conn. 2001). Thus, DIRECTV's competent summary judgment proof demonstrates not only that Defendant intercepted its satellite programming, but that Defendant intended to or did in fact resell and/or distribute those devices to other users.

### C. LEGAL AUTHORITIES AGAINST SUMMARY JUDGMENT

As stated above, the crux of the instant Motion is that even though (1) Defendant purchased multiple devices commonly used to intercept DIRECTV programming and is presumed to have illegally distributed those devices; and (2) that he owned the equipment necessary to receive the signal, there is nevertheless insufficient evidence of actual or attempted interception of DIRECTV's signal. Defendant's argument, though, wholly overlooks the necessary and probative use of circumstantial evidence to prove certain ultimate facts, such as in a crime or civil wrong that is committed privately. *See e.g.,* Apple Computer, Inc. v. Microsoft, 35 F.3d 1435, 1442 (9th Cir. 1994) (copyright theft); McElveen v. McElveen, 506 S.E.2d 1, 7 (S.C. Ct. App. 1998) (adultery); United States v. Fisher, 912 F.2d 728, 730 (4th Cir. 1990) (conviction for intent to sell narcotics may be based purely on circumstantial evidence that the defendant possessed more drugs than she could have personally used); Walker v. Darby, 911 F.2d 1573, 1578 (11th Cir. 1990) (circumstantial evidence sufficient to prove wiretap claim, including actual interception).

In a cable television piracy case, at least one Court has presumed, without any direct proof, an illegal use based on possession alone of cable descrambling equipment. Community Televisions Systems, Inc. v. Caruso, 134 F.Supp. 455 (D. Conn. 2000), *aff'd. in relevant part,* 284 F.3d 340 (2d Cir. 2002). In Caruso, TCI was a cable television supplier, and the defendants purchased broadcast descramblers from a manufacturer and seller of descramblers. Id. at 457. Because the devices were sold to and sent to the defendants, the court concluded that "the most reasonable inference is that . . . the descrambler could be used for its intended purpose, namely to receive cable services over TCI's cable system." Id. at 160. Significantly, the court found that "the defendants appear to fail to recognize the weight that is properly given circumstantial evidence." Id. at 461.

In the arena of satellite theft, DIRECTV has successfully defeated Summary Judgment motions by proffering circumstantial evidence identical to DIRECTV's proof in the instant case which raised or tended to raise an inference of interception. In <u>DIRECTV v. Karpinsky</u>, 274 F.Supp. 2d. 918 (E.D. Mich. 2003), a Motion for Summary Judgment predicated on no direct evidence of interception was defeated by (1) demonstrating that the defendant purchased and received pirate devices; (2) submitting statements by DIRECTV's expert that such devices have no use other than pirating satellite signals; and (3) submitting evidence that the defendant had the necessary equipment to intercept DIRECTV's programming. <u>Karpinsky</u>, 274 F.Supp. 2d at 927. The Court concluded that based on evidence that the Defendant had acquired the equipment required for satellite reception, coupled with his purchase of a pirate device and the affidavit testimony concerning the uses of those devices, there was sufficient evidence to defeat summary judgment.

In yet another case, DIRECTV has survived dismissal of its claims with proof identical to the case at bar. <u>DIRECTV v. Miller</u>, 2003 U.S. Dist. LEXIS 24958 (U.S. Dist. Fla. Nov. 20, 2003). In <u>Miller</u>, the defendant purchased two unloopers. <u>Id.</u> at *2. The Court in that case recognized the folly of requiring DIRECTV to produce "eyewitness testimony or videotape evidence of Defendant sitting in his living room watching DIRECTV for free" and denied the Motion for Summary Judgment based on the Defendant's purchase of the pirate device alone, reasoning that a reasonable jury could conclude that Defendant stole DIRECTV's programming. <u>Id.</u> at *9. In support of its inference of signal theft, the Court acknowledged that "[b]ased on their life experience, a jury could reasonably assume that people buy electronic equipment such as televisions, computers, or (in the case of Defendant) satellite piracy unloopers when they plan to use such equipment. It would be a strange world, after all, if people regularly bought such equipment and then put it in the closet to collect dust." <u>Id.</u> at *10; *see also* <u>DIRECTV, Inc. v. Spokish</u>, 2004 U.S. Dist. LEXIS 4092 (U.S. Dist. Court Fl., Feb. 19, 2004); *see also* <u>DIRECTV v. Murray</u>, 2004 U.S. LEXIS 5670, * 22 ("Evidence that defendant purchased electronic devices which are only useful for pirating plaintiff's satellite signal, together with evidence that defendant had all other means necessary to pirate plaintiff's signal, is circumstantial evidence that defendant actually pirated plaintiff's signal.").

As in the cases described above, this Court should also find or infer evidence of actual signal interception and deny Defendant's Motion. It is undisputed that the

Defendant purchased and received eight pirate devices (*Exhibit D*) from internet vendors that market those specific products for use in signal interception (*Exhibit A, pp. 6-7*); and that he has all of the equipment necessary to receive satellite programming (*Exhibit C; Exhibit A, p. 2*).   Based on the totality of the evidence, this Court should find or infer Defendant's attempted or actual interception of DIRECTV programming, thereby precluding dismissal of all of Plaintiff's statutory claims in this case.

## DIRECTV'S MOTION FOR CONTINUANCE TO CONDUCT DISCOVERY UNDER RULE 56(f)

In the alternative to an outright denial of Defendant's motion, DIRECTV files this Motion for Continuance to respond to Defendant's Motion pursuant to Rule 56(f).  One fundamental principle underlying summary judgment practice in federal court is that summary judgment should only be granted "after adequate time for discovery" has passed. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986).  In Celotex, the Supreme Court emphasized that federal courts need not allow parties to be "railroaded" by premature motions for summary judgment at an early stage of proceedings: "Any potential problem with such premature motions can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery." Id.

Defendant's Motion in this case is an axiomatic example of the abuse created by premature motions for summary judgment, and why the Supreme Court emphasized the need to allow "adequate time for discovery" before granting such relief.  Because the consequences of summary judgment are so severe, a court must be careful avoid premature termination. *See, e.g.,* Murrell v. Bennett, 615 F.2d 306 (5th Cir. 1980).  The uncontroverted facts and the inferences that can be reasonably drawn from the summary judgment record as set forth above are sufficient to avoid summary judgment. *See* Slaughter v. Southern Talc Co., 949 F.2d 167, 173 (5th Cir. 1991) (district court erred in finding that plaintiffs produced insufficient evidence to withstand summary judgment where plaintiffs' evidence provided a circumstantial case against defendants); *see also* Community Television Systems, Inc. v. Caruso, 134 F.Supp. 455 (D. Conn. 2000) (descrambling equipment purchased and installed by defendant creates a presumption of use).

Although Rule 56(b) allows a summary judgment motion to be brought "at any time," a court should not grant summary judgment where the nonmovant explains how it

needs and plans to obtain the information or evidence it needs through discovery. *See, e.g.*, Dresser Industries, Inc. v. Pyrrhus AG, 936 F.2d 921, 933 (7th Cir. 1991). Rule 56(f) expressly provides that "the court may refuse the application for judgment or order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had. . .". Only by allowing DIRECTV the opportunity to identify and question witnesses concerning questions unanswered in Defendant's affidavit, by deposing Defendant and by obtaining discovery from Defendant and third parties will Plaintiff be able to develop the evidentiary record. At this juncture, DIRECTV has been completely denied that opportunity.

Federal courts have generally recognized that a motion for summary judgment filed prior to the taking of *any* discovery, as is the case here, is premature and should be denied. *See, e.g.*, Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (District Court erred in granting summary judgment motion filed shortly after suit was served and before nonmovant had opportunity to take discovery); White's Landing Fisheries, Inc. v. Buchholzer, 29 F.3d 229, 231 (6th Cir. 1994) (grant of summary judgment without any opportunity for discovery was reversible error); Kagan v. Swider, 1999 U.S. Dist. LEXIS 14622 at *6-7 (E.D. La. September 20, 1999) (noting that summary judgment motion filed shortly after answer was "clearly premature" and that the parties should focus their efforts on discovery). Defendant filed his motion shortly after being served with this lawsuit, before any scheduling conference has taken place or before any scheduling order has been entered. Defendant is putting DIRECTV to its proof before any discovery has taken place and, indeed, before any discovery *could be* conducted.

In this case, Defendant has attached to his Motion an affidavit claiming he is innocent, and demands that the claims against him be dismissed without providing DIRECTV "an adequate time for discovery" to refute or rebut Defendant's assertions. No doubt every Defendant in every case would like to have the claims against him dismissed if he only files an affidavit denying wrongdoing soon after being served, but the Rules require more than that. DIRECTV has attached sufficient evidence in its response to Defendant's motions to raise a fact issue on its claims.[4] It has not, however, had the benefit of conducting discovery or deposing Defendant with respect to his protestations of innocence contained in this affidavit.

---

[4] *See* supra.

Plaintiff is entitled to discovery that would disprove Defendant's "I didn't do it" affidavit. At a minimum, DIRECTV is entitled to take Defendant's deposition and that of persons in his household who may have witnessed illegal piracy of its signal. As Defendant's Motion is premature, DIRECTV requests that this court defer ruling on the Motion until such time as discovery has been completed. Further, DIRECTV requests that it be permitted to supplement its response to Defendant's Motion as new evidence becomes available.

### III. SUMMARY AND PRAYER

In sum, Voreis cannot simply aver in a one-page affidavit that "he didn't do it" and avoid the inescapable inference any judge or jury would draw from a cumulative review of DIRECTV's competent summary judgment evidence filed in opposition to the Motion. That evidence, taken as a whole, creates an issue of material fact with respect to Defendant's interception or attempted interception of DIRECTV's satellite programming without authorization or permission, and his intended or actual distribution of such devices.

In any event, DIRECTV is entitled to conduct discovery with respect to the statements contained in Defendant's affidavit and requests that this Motion be continued until such discovery is completed. Based on the arguments and authorities set forth in this Response, together with DIRECTV's competent summary judgment proof submitted therewith, Defendant's Motion should be denied in all respects, or alternatively, continued until such time as DIRECTV is able to take discovery to prove its case.

Respectfully submitted,

RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.

By: _____

Lecia L. Chaney
State Bar No. 00785757
Fed. I.D. #16499
**Christopher E. Moore**
State Bar No. 24011075
Fed. I.D. #36611

1201 E. Van Buren St.
P.O. Box 2155
Brownsville, Texas 78522
Telephone: (956) 542-7441
Telefax    : (956) 541-2170

OF COUNSEL:

GREER, HERZ & ADAMS, LLP

**Joe A.C. Fulcher**
Federal ID No. 14126
St. Bar No. 07509320
**Kelly-Ann F. Clarke**
Federal ID No. 27195
St. Bar No. 24027929
**Robert A. Swofford**
Federal ID No. 19403
St. Bar No. 00791765
**Joseph R. Russo, Jr.**
Federal ID No. 22559
St. Bar No. 24002879
One Moody Plaza, 18th Floor
Galveston, Tx  77550
(409) 797-3200  (telephone)
(409) 766-6424  (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record, to-wit:

R.W. Armstrong
2600 Old Alice Road, Ste. A
Brownsville, Tx 78521
*Attorney for AARON VOREIS*

by certified mail, return receipt requested, facsimile transmission, and/or hand delivery pursuant to the Federal Rules of Civil Procedure on this the ___21___ day of June, 2004.

Lecia L. Chaney

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DIRECTV, Inc.,                    §
                                 §
        Plaintiff,               §
                                 §
v.                               §          No. B-03-194-5
                                 §
                                 §
AARON VOREIS,                    §
                                 §
        Defendant.               §

**AFFIDAVIT OF JAMES F. WHALEN IN SUPPORT OF DIRECTV INC.'S
RESPONSE TO DEFENDANT AARON VOREIS'
MOTION FOR SUMMARY JUDGMENT**

BEFORE ME, the undersigned authority, on this day personally appeared James F. Whalen, who is personally known to me, and being first duly sworn according to law, upon his oath, deposed and said:

"My name is James F. Whalen. I am over twenty-one (21) years of age and reside in Los Angeles County, California. I am currently a Senior Director for DIRECTV's Office of Signal Integrity and have held that position for over 3 years. As a Senior Director, I am familiar with the usual and customary business practices involved in all aspects of DIRECTV's investigations of individuals and businesses suspected of illegally obtaining access to DIRECTV programming and the damages that illegal interception causes to the company.

DIRECTV is the nation's leading direct broadcast satellite programming provider, delivering over 225 channels of television and other programming to more than 12 million customers in the United States. DIRECTV satellite programming currently includes major cable networks, local stations, studio movies and special events programming, as well as a variety of sports and other special interest programming. DIRECTV has invested billions of dollars to develop its direct



EXHIBIT
_A_

broadcast satellite system.

DIRECTV encrypts – electronically scrambles – its satellite transmissions to provide security for and prevent unauthorized viewing of its satellite television programming. DIRECTV offers its television programming to residential and business customers on a subscription and pay-per-view basis only. Each customer is required to obtain DIRECTV satellite hardware (including a small satellite dish and a DIRECTV receiver/descrambler ("IRD") with DIRECTV Access Card) and is required to establish an account with DIRECTV. Upon activation of the Access Card by DIRECTV, the customer can receive and view in a decrypted format (*i.e.*, unscrambled) those channels to which the customer has subscribed or otherwise made arrangement to purchase from DIRECTV. Each DIRECTV access card contains an embedded microprocessor and uses smartcard technology to (1) control which DIRECTV programming the IRD descrambles based on the programming package or other programming specifically purchased by the subscriber, and (2) capture and transmit to DIRECTV the subscriber's pay-per-view information (via a telephone modem in the IRD). Distributors of pirate access devices or illegally modified access cards routinely advise purchasers of piracy equipment not to plug their IRD units into a phone line to avoid a callback and to prevent detection by DIRECTV.

DIRECTV offers several different satellite television packages. DIRECTV offers 40 premium movie channels, including several Home Box Office®, Showtime®, Cinemax®, Movie Channel®, and Encore® channels, the Family Pack™ and local channels for many markets throughout the United States. Importantly, DIRECTV targets individuals interested in specialized sports packages and offers subscriptions to those specialized sporting packages, including NFL Sunday Ticket™, NBA League Pass™, NHL Center Ice™, MLB Extra Innings™, ESPN Game Plan™, ESPN Full Court™, MLS/ESPN Shootout™, WNBA Season Pass™, and Mega March Madness™. Each of

2

Jun-18-2004  10:38am  From-                                    3109644720         T-258  P.016/021  F-020

these packages can be purchased independent of the basic subscription fee. DIRECTV also offers specialized one-time viewing movies and events in the form of pay-per-view channels, with countless pay-per-view boxing and special event matches. DIRECTV incurs incredible expense acquiring the rights to distribute all of this television programming and service. For that reason, DIRECTV diligently protects its distribution rights.

Since DIRECTV has acquired such a complete line-up of quality channels, movies, and specialized programs and sporting events, individuals go to great lengths to circumvent DIRECTV's encryption and security measures. The number of individuals involved in the manufacture and sale of illegal devices used to circumvent DIRECTV's encryption technology has increased since DIRECTV began operations in 1994. The business of piracy can be a lucrative endeavor both for the large manufacturer and the small dealer. Records obtained pursuant to raids in Canada and in the United States show that pirates have generated substantial revenues from the distribution and manufacture of illegal access devices, often amounting to millions of dollars for an individual distributor of pirate devices. Obviously, there is a substantial black market for pirate access devices used in conjunction with DIRECTV systems, and DIRECTV is pursuing all available avenues to curtail those sales.

Piracy itself affects DIRECTV immeasurably. An individual using one pirated DIRECTV access card has access to over a million dollars in annual programming services and would not have to pay for any of it. That figure includes the value of every pay-per-view movie even though the same movie is shown several times a day. Recognizing that not many will view one movie more than once, DIRECTV has also calculated the value of all subscription packages and movies viewed only once. That value is well over $150,000.00 annually. While DIRECTV has gone to significant efforts to acquire programming distribution rights from program providers such as HBO© and ESPN©, any

3

loss of confidence by such providers in the security of DIRECTV's signal may affect DIRECTV's ability to obtain those rights in the future.

In summary, DIRECTV encrypts its transmissions to provide security for and prevent unauthorized reception of that programming. DIRECTV provides subscribers with access cards specifically developed for the DIRECTV system. Each DIRECTV access card contains a microprocessor and uses smartcard technology to control the subscriber's access to DIRECTV's programming consistent with the programming purchased by the subscriber.

### Evidence of Voreis' Purchases of Devices Designed for Piracy

Several individuals and companies have engaged in the manufacture and sale of illegal equipment used to circumvent DIRECTV's encryption technology. On or about November 29, 2001, DIRECTV executed Writs of Seizure with the assistance of the U.S. Marshal Service, in the matter of DIRECTV v. Derek Trone (hereinafter "Trone") et al., Civil Action No. SA CV 01-370 DOC (ANx), in the United States District Court for the Central District of California against Li Sang and his business known as Digital Source Solutions d/b/a/ DssPro (hereinafter "DSSPRO"). DSSPRO sold and distributed satellite signal theft devices primarily through its websites, "www.dsspro.com," "www.dssna.com," and "www.dsszone.com." Subsequent to the raids, DIRECTV came into possession of a substantial body of sales records, shipping records, email communications, credit card receipts, and other records. Those records evidence Defendant Voreis' purchase of illegal Pirate Access Devices.

Further, on or about December 1, 2001, DIRECTV executed a Writ of Seizure, with the assistance of local law enforcement, at the residence of Scott Gray, who owned and operated "The Computer Shanty" ("Shanty"). The Computer Shanty was located physically in El Paso, Texas and at times relevant to this case was an enterprise focused on distributing electronic devices primarily

4

designed for the surreptitious interception of satellite communications broadcast by DIRECTV.
Subsequent to the raid, DIRECTV came into possession of a substantial body of sales records,
shipping records, email communications, credit card receipts and other records. Those records also
evidence Defendant Voreis' purchase of illegal Pirate Access Devices.

      I am familiar with the operation of devices used to obtain access to DIRECTV's satellite
signal without authorization. The two programmer devices purchased by Defendant Voreis, the
Netsignia 210 Programmers, can be used and are marketed to be used to permit the illegal
programming of – writing of code to – valid DIRECTV access cards for the sole purpose of
obtaining access to DIRECTV Satellite Programming without paying DIRECTV.

      The other multiple devices purchased by Defendant Voreis, the "Emulator Complete with
Cables" and the Shanty Blue PS2 Powered Emulator, are emulator devices. Generally, an emulagtor
connects to a serial port of a personal computer and to the slot where an access card usually resides
in a DIRECTV IRD ("receiver"). The personal computer, which must be also be connected to a
smart card reader/writer with a DIRECTV access card inserted, runs pirate software which duplicates
or "emulates" certain functions of a DIRECTV access card, then sends signals to the DIRECTV
receiver that allow it to "emulate" a DIRECTV access card. This function is particularly useful to
satellite pirates because the use of an emulator in the DIRECTV receiver slot protects the pirate's
DIRECTV access card from DIRECTV ECMs. The emulation software is resident on the PC and
simulates most of the functions of the DIRECTV access card to allow the user to view all
unauthorized DIRECTV programming services, including Pay-Per-View, without payment to
DIRECTV. Emulation software was widely available over the internet for free at the time of
Defendant's purchases from the Computer Shanty.

      Other devices purchased by Defendant include the Terminal Bootloader, the ISO 3 in 1

5

Programmer/Bootloader and the Shanty Bootloader Green.   A Bootloader is a fixed functionality hardware device that was specifically designed to allow the use of a DIRECTV Access Card that was subjected to an Electronic Counter Measure (ECM).  The bootloader device is typically inserted into the user's integrated receiver and connected to the disabled DIRECTV access card.  On January 21, 2001, DIRECTV released an ECM that rendered certain unauthorized DIRECTV Access Cards inoperable.  The "Black Sunday" ECM wrote values to a portion of the write once memory in DIRECTV Access Cards that had been altered by unauthorized means.  DIRECTV Access Cards check the write-once memory during their boot cycle and are inoperable if they detect new values from the ECM.  The Bootloaders provide a "glitch" that causes the DIRECTV Access Card to skip this check for the particular write-once memory value, thereby circumventing the effect of the ECM.  The "glitch" occurs in the power supply for the DIRECTV Access Card at a specific time.  The Bootloaders employ counting circuitry to count the predetermined clock-cycle to employ the "glitch" at the appropriate moment.  Bootloaders do not have any legitimate uses.  No additional software is required by the Bootloaders to intercept DIRECTV's signal.

The purchase and use of a bootloader is a clear indication of a customer's eagerness to continue illegal access to DIRECTV television programming without payment to DIRECTV. Furthermore, purchase of that device indicates that the person already possessed one or more illegally modified DIRECTV access cards.  There is no reason to purchase a bootloader unless the purchaser is in possession of a DIRECTV Access Card that has been hacked and disabled by an ECM. Therefore, it is reasonably likely that Voreis possessed an illegally modified Access Card and began receiving DIRECTV's transmissions without authorization prior to his purchase of the bootloaders.

### Evidence of the Marketing of the Devices

6

Jun-18-2004  10:40am  From-                        3109644720              T-258  P.020/021  F-020

Information on the websites operated by the Computer Shanty and DSSPRO from which the Defendant's purchases were made describe devices primarily designed and used for the purpose of obtaining DIRECTV programming without payment or authorization. Prints of those websites are attached to this affidavit at Exhibit **3** and are the type of information typically relied upon by DIRECTV in assessing the design, marketing and purpose of devices. The way in which Computer Shanty and DSSPRO marketed their devices supports my conclusion that its devices were produced primarily for the purpose of receiving DIRECTV programming for free. The Internet web sites operated by the company and attached hereto were devoted to selling devices to obtain DIRECTV satellite programming without payment to or authorization from DIRECTV.

7

Based on (1) Voreis' purchases of eight devices capable of intercepting DIRECTV's programming; (2) Computer Shanty's and DSSPRO's marketing of those devices to individuals for the specific purpose of stealing DIRECTV programming; and (3) his ownership of all of the equipment required to receive DIRECTV programming, there is little question that Voreis gained unauthorized access to DIRECTV programming. Further, based on the number of devices purchased by Voreis, it is probable that he was involved in the sale and/or distribution of some of those devices.

_____
James F. Whalen

STATE OF CALIFORNIA        )
                           )
COUNTY OF LOS ANGELES      )

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 18 day of June, 2004, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC in and for
The State of California
My commission expires: 02/09/05

ALEXIS FLORES CLARK
Comm. No. 1293570
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Exp. Feb. 9, 2005

8



**EMAIL OF FOR
QUANTITY
PRICING ON ANY
PRODUCTS**

Home - Tech Spt Page - Who We Are - Shipping Options - Terms - Testimonials - Disclaimer

We do not ship to PO Boxes - Only exception are those Paypay Confirmed Address', as we will not ship to any paypal
address other than the confirmed! P.O. Box Orders              delay shipping by 1 Additional Business Day.



*Order Here*

## SMARTCARD PROGRAMMERS

**Netsignia 210 Smartcard Reader/Writer
Programmer**

### Now Only $75.00

# SPECIAL $69.45

*Order Here*

90 Day Warranty - IN STOCK SHIPPING IMMEDIATELY
**Additional Info**

### $75.00

**Unadvertised anywhere but here Limited Time Special**

# Special $69.45

This system due to its autosensing feature covering
smartcards from 1.2 - 3.57 - 3.68 to 4MHz

**THE <u>NEXT</u> GENERATION IN UNIVERSAL
MICRO SMART CARD INTERFACES IS
HERE
1.2 - 4MHz Auto Sensing for All ISO7816
Smartcards**

*Order Here*

**Additional Info**

*In-Stock Shipping Immediately*



# $59.45



**EXHIBIT
1**

Shanty Order Products Page                                      http://www.shanty.com/programmers.htm



### The Shanty Programmer

Standard ISO7816 Programmer - Not Enclosed. Compete with Free External Power Supply & Cable. For those old timers that appreciate a value and not PS2 Powered :)

Order Here

## Additional Info

*In-Stock Shipping Immediately*





check the review of this product by clicking here

$79.95

**IN STOCK SHIPPING IMMEDIATELY DAILY!**
**This is a Shanty Product!!**



Order Here



90 Day Warranty

## Additional Info

---

### SD-EMU $75.00



You can choose to either use the RJ45 or the DB9 Serial Connector. Units Ships with a 6' Serial Cable and we as of 7th of August, also toss in FREE of Charge the DB9 to RJ45 Adapter for you. I will have the wiring diagram us shortly. Wait until Tuesday to order these unless you want to just use the Serial Cable. If wanting the RJ45, wait until we are shipping the adapter. Others are sending you out to Radio Shack or not providing any assistance. Sure, we are a few dollars more, but we do NOT cut corners for 0ur customers EVER!

Order Here

I had put up the part number for you to purchase for the RJ45 to DB9, but heck, I just ordered 1000 and they will start shipping with that and the Serial Cable on Tuesday Orders. Radio Shack is Crazy on the price, I will toss them in for FREE

**THIS IS NOT A BOOTLOADER OR PROGRAMMER. IT IS JUST AN EMU/DATALOGGER.**

## Additional Info Click Here



**Wiring Diagram for the Free RJ45 to DB9 We provide**
**Adobe Reader Format**

check the review of this product by clicking
here



**This is a Shanty Product**

*In-Stock Shipping Immediately*



## Shanty IV DB9 - RJ-11 Emulator

**complete with Datalogger, 14 Foot Straight Through**
**RJ-11 Cable and DB9 to RJ-11**

**We are sending an extra MC1489 Chip with each**
**unit, this will double your life. This one chip design if**
**hit by lightning, just change the extra chip we send.**

 **$59.45** 

Order Here

## Additional Info

### Smartcard System
### Standard ISO7816 UnCoded Devices

These devices comply with the Industry standard ISO7816 Compliancy. The Microprocessors on these devices come
uncoded. It is the responsibility of the end user to FLASH The Microporcessor (AtMel) chip for their own application.

The                        in Smartcard Design and Recovery Systems

Reviw of this product clicking here



*In-Stock Shipping Immediately*



## "The Ultimate!"

### ISO7816 Compliant Smartcard Repair System

To comply with ISO 7816 standards all Systems
are shipped with the Atmel Uncoded.

You will need to flash your unit to the code of
your choice once received.
click here for freeware

 **Only $179.95** 

## Additional Info

Order Here

What does CODE Free mean? Simply, our ISO7816 Smart Card System Above come with no Code
(software) on the AtMel. This is yet a further step to ensure our products do not leave here with any
illegal intent in mind for usage. We Emplore you to NOT use any of our products for illegal usage in

Shanty Order Products Page                                    http://www.shanty.com/programmers.htm

your Jurisdiction. Flashing Instructions are all over the internet. It is a 30 second process and simple and yet one more way for us to comply completely with all laws and jurisdictions within the United States of America.

# COMBOS



| | |
|---|---|
|  **shipping immediately** | **The Ultimate - Netsignia 210 and Shanty IV Emulator Combo**<br>**All cables and Accessories for operation included FREE**<br>**$279.95**<br><br>Order Here |
| <br> **shipping immediately** | **The Ultimate - Netsignia 210 and Shanty PS2 Blue EMU Combo**<br>**All cables and Accessories for operation included FREE**<br>**$299.95**<br><br>Order Here |
|  **shipping Immediately** | **Netsignia 210 Smartcard Reader - Shanty PS2 Powered Complete EMU** ~~**$154.95**~~<br>**WE BE CRAZY AGAIN Our #1 Sold Combo Even Less? Where is the Prozac!**<br><br># $139.50<br>Order Here |
|  **shipping Immediately** | **NEW PRICE - ~~$144~~**<br><br>Yes at **$119.99** we have lost our Minds!<br><br>**Netsignia 210 Smartcard Programmer & Shanty IV EMU**<br>**Comes Complete with 14 Foot of RJ 11 Phone Cable**<br>Order Here |



In need of a great Computer? Well look no further. In conjunction with The Computer Shanty and getdataloggers.com, we have worked out a special price for you of only $110 (+shipping) on brand new Pentium 150Mhz Systems.

Click here and do not forget to tell them SHANTY sent you!







**Parts / Accessories**

| $8.95 | $6.95 | $9.95 | $15.95 |
|---|---|---|---|
| 9 Volt DC barrel size 2.1mm X 5.5mm | 6 ft 9 pin RS232 9 pin Male to 9 pin Female. | PS2 Mouse with Web Browser Scroll Button. See this at many stores for $29.95 | 4 Port Mini (Small) USB Port. Use one USB Plug and turn it into 4 More. Great for PCs/Notbooks/PDA Devices with USB Ports. Lightweight! |
| Order Here | Order Here | Order Here | Order Here |

**Parts / Accessories**

| $12.95 | $2.95 |
|---|---|
| This is the cable that comes with our Shanty PS2 Powered EMU. Why, I do not know, but many have asked us if we sell them seperately, so we again listen to you! RJ45/PS2/DB9 10 Foot Custom Straight Through Cable. | **RJ-11/12 to DB9** |
| | This is the unwired unit used to go from RJ-11 Phone cable to 9 Pin Serial. Click on additional info for your particular wiring instructions. We cannot send them pre-wired, as you can wire it Straight Through, as in Our Shanty IV Datalogger, but other dataloggers are wired Twisted Pair as well. |
| | **Additional Info** |
| Order Here | Order Here |

We do not believe anyone sells their accessories for less than we do, but let us know!

Please be sure to enter correct *Expiration Date, E-Mail address* as well as *Credit Card Number.* A number of our customers encounter error when ordering due to incorrect Expiration Date, email address and card number. If you receive a error message, please go back and check to be sure all info are correct!!



smartcards, dss, dish, food, desert, wine                                    http://www.shanty.com/



**Privacy of your
Information On all
Mail in orders**

**WE ONLY SHIP IN THE U.S.A.**

>>>>>>>>>**Terms Read Here**<<<<<<<<<<

**"We have no quarrel with those who sell for less they should
know what their products are worth"**

Smartcard Programmers - Accessories - Data Loggers

GLADLY                              ACCEPTED

**24 Hour Secure Online Ordering**

**IN THE STATE OF ILLINOIS**          §
                                       §
**COUNTY OF TAZEWELL**                 §

### AFFIDAVIT OF BILL GATLIFF

BEFORE ME, the undersigned authority, on this day personally appeared Bill

Gatliff, who is personally known to me, and being first duly sworn according to law,

upon his oath, deposed and said:

1.      My name is Bill Gatliff. I am over twenty-one (21) years of age and reside

in Illinois. I am an electrical engineer with a formal background in computer science and

a decade of programming, teaching and business experience. Among other things, I work

for Netrino, LLC ("Netrino"). Netrino is an engineering services company specializing in

the design and analysis of embedded systems. Netrino has been retained by DIRECTV to

provide expert testimony in relation to DIRECTV's claims. In connection therewith,

experts working for Netrino, including myself, have reviewed publicly available

information on methods of circumventing conditional access controls to illegally receive

DIRECTV programming, publicly available information regarding smartcards (including

ISO 7816 standards) and devices provided by DIRECTV. I personally have analyzed

several different types of devices distributed by various vendors.

2.      It is the regular course of business of Netrino, L.L.C. to generate expert

report and to maintain records concerning the expert reports it has generated. The reports

are kept by Netrino, L.L.C. in the course of its regularly conducted business activities,

131202.1



and it is the regular course of business for an expert with Netrino, L.L.C. with knowledge

of the event, or from information transmitted by a person with knowledge of the event, to

create such expert reports at or near the time of the event or reasonably soon thereafter.

     3.     Attached to this affidavit as **Exhibit 1** are the complete reports (except that

schedule 1 is not attached) providing a description of the various devices typically

utilized by individuals seeking to gain unauthorized access to DIRECTV programming

and reports specific to the design and utility of devices at issue.  The information

contained in these documents is hereby incorporated into this affidavit by reference as if

fully set forth herein.  I have reviewed the devices, analysis and opinions provided in each

Netrino report attached hereto, I am in agreement with that analysis and opinion and

adopt each analysis and opinion regarding the devices provided in each document

attached as my own.  In relation to an analysis of the marketing and intended utility of

devices such as those involved in this case, it is not uncommon to review and rely upon

advertising or website material relating to the marketing of the device in question.

     I declare under penalty of perjury that the foregoing is true and correct.

     FURTHER, AFFIANT SAITH NOT.

     Executed on this 20th day of May, 2004.

Bill Gatliff

# Netrino

# Expert Report:

# NetSignia 210 Reader/Writer

## David E. Simon

October 29, 2003

This document describes my independent opinion regarding the nature of the NetSignia 210 Reader/Writer, and the supporting evidence and analysis I used to reach that opinion.

## **Background**

On October 8, 2003, I received a device described as a NetSignia 210 Reader/Writer from DIRECTV for analysis. I was asked to review the design of this device and render my independent opinion as to its nature.

To perform my analysis, I carefully examined the design of the hardware through visual and electrical inspection, and I compared it with similar devices. In some of this work, I have been assisted by Richard Steinberg, also of Octave Software Group, Inc, and by Michael Barr and Bill Gatliff, who are other experts in this field.

The NetSignia 210 Reader/Writer is a small electrical device that is slightly larger than a DIRECTV access card. It contains a serial cable to be connected to the user's personal



EXHIBIT

1

computer, a connector into which a smartcard can be inserted, and a few electrical components including two integrated circuits, several resistors, and interconnecting circuitry.

Figure 1 is a photograph of the NetSignia 210 Reader/Writer with an inserted DIRECTV P2/H access card, showing that the top of the case is labeled "Litronic" and "netsignia 210".



*Figure 1  The NetSignia 210 Reader/Writer and a P2/H access card*

Figure 2 shows the top side of the NetSignia 210 Reader/Writer's circuit board. The top side has no text and no components.

Netsignia 210 Reader/Writer                                    October 29, 2003



*Figure 2  A closeup of the NetSignia 210 Reader/Writer (top)*

Figure 3 shows the bottom side of the NetSignia 210 Reader/Writer's circuit board.  Note that the board contains a slot the appropriate size and shape to hold an ISO 7816-compliant smartcard.  Text on the bottom of the circuit board includes:

> 190N00230V300
> Rev: 3.00

and:

> 0042

Page 3 of 9



*Figure 3  A closeup of the NetSignia 210 Reader/Writer (bottom)*

## Opinion

The NetSignia 210 Reader/Writer can be used to circumvent DIRECTV access controls. By circumventing these access controls, it is possible to obtain DIRECTV content, including pay-per-views and premium channels, without paying for it.

## Supporting Evidence and Analysis – Summary

An examination of the behavior of the NetSignia 210 Reader/Writer reveals that it is intended to allow programs running on the user's PC to communicate with an ISO 7816 smartcard inserted into the smartcard slot in the NetSignia.  There are two possible ways to use such a device to circumvent DIRECTV access controls.  First, the P2/H cards contained a security flaw, and a program running on a user's PC called BasicH (and possibly other programs) can use the NetSignia to exploit that flaw and to modify the contents of the P2/H card to obtain programming without paying for it.  Second, another

program running on a user's PC called Kryptonite (and possibly other programs) can use the NetSignia to communicate with a P3/HU card and subsequently trick a DIRECTV receiver into providing signals for which the user has not paid.

## Supporting Evidence and Analysis – Details

**Evidence: The NetSignia 210 Reader/Writer contains circuitry designed to allow a PC to communicate with an ISO 7816 smartcard, including DirecTV access cards, inserted into its smartcard slot.**

Figure 4 is a portion of an electrical schematic for the NetSignia 210 Reader/Writer.  I produced this by examination of the actual device.



*Figure 4  Partial schematic diagram for the NetSignia 210 Reader/Writer*

In the NetSignia 210 Reader/Writer design, the serial port on the user's computer is connected to the lines labeled PC-RTS, PC-TXD, PC-DCD, and PC-RXD on the left side

Page 5 of 9

of the schematic. Those signals travel to U1, a voltage converter chip that translates the voltage levels used by the serial port (-12 volts and +12 volts) to those used by the smart card (0 volts and 5 volts). The converted signals emerge on the right side of the U1 and continue on to the inserted smartcard via the connections CAM-RST and CAM-IO.

Additional circuitry provided by U2 and Y1 provides a fixed-speed clock signal to the CAM-CLK line on an inserted smartcard.

The clock signal provided to the CAM-CLK connection on the smartcard allows the microprocessor in the smartcard to function. The connection of PC-RTS to CAM-RST (through the voltage converter) allows the PC to reset the smartcard. The connection of PC-RXD and PC-TXD to CAM-IO allows the PC to send messages to the smartcard and receive the smartcard's responses. Thus, a PC can communicate with the smartcard using this device. The connection to PC-DCD allows the PC to know whether or not a smartcard is actually inserted into the device.

**Evidence: The NetSignia 210 Reader/Writer, in combination with specialized PC software, BasicH (and possibly others), can be used to modify a DIRECTV P2/H access card so as to circumvent DIRECTV access controls.**

*BasicH* is a freely available program that works in conjunction with ISO 7816 reader/writer devices such as the NetSignia 210 Reader/Writer. It exploits security weaknesses of the DIRECTV P2/H access card to read and modify the contents of nonvolatile memory on the access card. The modified access card can then be inserted into a DIRECTV receiver to permit access to DIRECTV programming without paying for it.

To test this use of the NetSignia 210 Reader/Writer, my colleague Richard Steinberg downloaded the BasicH software and installed it on a PC. I then connected the NetSignia 210 Reader/Writer to that PC via a serial port. I inserted into the NetSignia 210 Reader/Writer one of the P2/H access cards that DIRECTV provided for testing purposes. Then I ran BasicH.

With BasicH running, its menu commands allowed me to dump the entire contents of the nonvolatile memory and change portions of it. I modified an area of the nonvolatile memory identified by BasicH as the card's "CAM-ID. I changed the time zone recorded in the nonvolatile memory, using a BasicH menu choice for the purpose. I "unmarry'd" the card using a BasicH menu choice, after which BasicH reported that the number of the "IRD" (DIRECTV receiver box) which the card had stored was zero, whereas before it had been nonzero. I believe that all of these activities are used for the purpose of circumventing DIRECTV's conditional access controls.

**Evidence: The NetSignia 210 Reader/Writer used in combination with specialized PC software (Kryptonite and possibly others), an "emulator" (Cobalt Emulator and possibly others), and a DIRECTV P3/HU card, can be used to circumvent DIRECTV access controls.**

*Kryptonite* is a freely available program for *HU emulation*, a technique that uses an "emulator" such as the Cobalt Emulator, a reader/writer such as the NetSignia 210 Reader/Writer, and extensive software on a PC. Instead of inserting the DIRECTV access card into a DIRECTV receiver, the user inserts an emulator into the DIRECTV receiver. The emulator sends the commands from the DIRECTV receiver to a PC running Kryptonite. Kryptonite in turn connects to a reader/writer such as the NetSignia 210 Reader/Writer and communicates with a P3/HU card installed in the reader/writer device. To the DIRECTV receiver the Kryptonite program pretends to be a DIRECTV access card. It uses certain of the functions of the P3/HU card to assist it with this pretense. Through this method, Kryptonite permits access to DIRECTV programming without paying for it.

To test this use of the NetSignia 210 Reader/Writer, my colleague Richard Steinberg located version v2.2.3 of the Kryptonite software, along with instructions for using it, at http://www.sublevel9.com/krypto.html, downloaded it, and installed it on a PC. Following the instructions, he used a device called an unlooper to modify a never-activated P3/HU access card that DIRECTV had provided us for testing purposes. He attached the NetSignia 210 Reader/Writer to the PC via serial port COM1 and inserted

into the reader/writer the modified access card. He connected a Cobalt Emulator device to the PC via serial port COM2. He then ran Kryptonite and inserted the Cobalt Emulator into the DIRECTV receiver. Figure 5 shows the configuration used in this testing.



*Figure 5  Pirate software called Kryptonite works with the NetSignia 210 Reader/Writer. The display on the television screen shows that the system is receiving a PPV (pay-per-view) channel.*

While using the hardware configuration shown, which included the NetSignia 210 Reader/Writer, and Kryptonite I was able to view DIRECTV's basic channels, such as

CNN, CNBC, and NBC, along with premium channels such as HBO, Showtime, Fox Sports Network and others without paying for them. In addition, I was also able to watch pay-per-view movies without limit and without those purchase records being preserved for DIRECTV's accounting servers.

Respectfully submitted,

_____     _____          _____

Author's Name (Printed)     Signature                        Date

Netsignia 210 Reader/Writer                                October 29, 2003

CNN, CNBC, and NBC, along with premium channels such as HBO, Showtime, Fox
Sports Network and others without paying for them. In addition, I was also able to watch
pay-per-view movies without limit and without those purchase records being preserved
for DIRECTV's accounting servers.

Respectfully submitted,

_DAVID E SIMON_                                    _10/31/63_

Author's Name (Printed)     Signature                    Date

# Netrino

**Bill Gatliff**

# Expert Report: The Terminator P.S.B. Device

September 3, 2003

This document describes my opinion regarding the primary function of the Terminator P.S.B. device. It also provides the supporting evidence and analysis I used to reach that opinion.

## Opinion

The primary function of the Terminator P.S.B. device is to circumvent DIRECTV access controls. By circumventing these access controls, a viewer can obtain paid DIRECTV products like Pay Per View and premium channels without paying for them.

## Background

The *Terminator P.S.B.* is shown in Figure 1. It is a small electronic device, with visible connectors for a DIRECTV access card (also shown), and an optional power connection. The top of the device also features a handful of chips including an Atmel microprocessor, an LED labeled "POWER", and an adjustable potentiometer labeled POT1.

The back side of the Terminator P.S.B., shown in Figure 2, features a smart card

connector pattern, visible on the right edge of the card as it appears in the image.

The Terminator P.S.B. device has no enclosure, and is normally inserted into a DIRECTV satellite receiver's conditional access card slot as shown in Figure 3.



*Figure 1: The Terminator P.S.B.*



*Figure 2: The bootom of the Terminator P.S.B.*



*Figure 3: The Terminator P.S.B during use.*

Overall, the Terminator P.S.B. appears professionally designed and constructed.

## Supporting Evidence and Analysis

**Evidence: The Terminator P.S.B.'s circuitry is clearly designed to facilitate *glitching* of an inserted DIRECTV access card.**

Figure 4 is a portion of the electrical schematic for the Terminator P.S.B. I produced this schematic after careful study of an actual Terminator P.S.B. device.

Under normal operation, power flows from the DIRECTV receiver's access card slot through PAD-C1 (one of the flat, silver-colored connectors on the right side of Figure 2), through resistors R3 and POT1, and out to the inserted access card via connector C1. In this state, the inserted access card functions normally.



*Figure 4: Partial Terminator P.S.B. schematic*

When the Terminator P.S.B.'s Atmel microprocessor (component U1 in the schematic) asserts output PB4, however, component U3 lowers the voltage going to the inserted access card by dissipating some of the power going to the access card through resistor R2. This brief interruption in voltage is called a *glitch*.

No standard smart card reader that I have studied contains any circuitry similar to that found in the Terminator P.S.B. In particular, standard smart card readers like the popular ACR30S product do not manipulate the power going to an inserted access card, beyond merely turning the card on and off.

The capability to deliver a glitch to an inserted access card is not required or recommended by any relevant ISO smart card standard. Glitches cause erroneous card operation, something that is generally undesirable for normal activities.

**Evidence: The Terminator P.S.B. glitches an access card automatically upon insertion into a DIRECTV receiver.**

The Terminator P.S.B. is a hands-free device. I plugged my access card into the Terminator P.S.B., plugged the Terminator P.S.B. into my DIRECTV receiver, and it glitched the access card automatically without any additional effort on my part.

I used an oscilloscope to observe the Terminator P.S.B. while it glitched an access card.
Figure 5 and Figure 6 show my test setup during Terminator P.S.B. operation.



*Figure 5: Test setup for observing the Terminator P.S.B.*



*Figure 6: Closeup of connections to Terminator P.S.B.*

Figure 7 is an oscilloscope trace that shows a glitch delivered by the Terminator P.S.B.
The top line is the voltage going to the access card, which is normally in the range 4.5-5.5
VDC. The bottom line is the clock signal provided by the DIRECTV receiver, which is

the primary reference for glitch timing.

During the glitch, the Terminator P.S.B. lowers the voltage to about 3 VDC, well under the level required for normal operation of the inserted access card. While the voltage is lowered during a glitch, the access card operates erroneously, or ceases to function completely.



*Figure 7: A glitch delivered by the Terminator P.S.B.*

Glitching is not an exact science, and sometimes a glitch voltage that circumvents access controls in one access card will not work for another one. The Terminator P.S.B. features an adjustment screw on resistor POT1, which allows a user to adjust the amount the voltage is lowered during a glitch.

Figure 8 shows another glitch delivered by the Terminator P.S.B., this time after I rotated the adjustment screw on POT1 a few turns. The glitch voltage is now about 1 VDC, which is exceedingly well below an operational voltage for the inserted access card.



*Figure 8: Another glitch delivered by the Terminator P.S.B.*

A properly-timed glitch of the right voltage causes the inserted access card to skip checks that determine which DIRECTV channels a viewer is allowed to watch. When these checks are skipped, a viewer can see channels they have not paid for.

**Evidence: A typical user cannot modify the basic operation of the Terminator P.S.B.**

The Terminator P.S.B. provides no additional connectors or circuitry to facilitate reprogramming of the device's onboard Atmel microprocessor, which would be a necessary step to modify the function of the device. Additionally, features available in the Terminator P.S.B.'s onboard Atmel microprocessor require connections to one or more of the chip's external pins; most of these pins are not connected to anything in the Terminator P.S.B. circuitry.

**Evidence: There is no general-purpose circuitry in the Terminator P.S.B.**

The partial schematic diagram shown in Figure 4 describes all of the active circuitry present in the Terminator P.S.B. A more general-purpose product would feature additional connectors and circuitry to facilitate its use in a larger variety of applications.

**Evidence: The Terminator P.S.B. does not allow you to adjust glitch timing.**

A successful glitch must be applied at a precise moment during operation of the inserted access card, corresponding to a particular instruction in the access card's internal code that must be skipped or caused to malfunction. While the voltage level of a glitch might need to be adjusted between access cards due to normal manufacturing variations, the codes present in a targeted class of DIRECTV access cards are identical, meaning that the time the glitch must be applied is exactly the same for that entire family of access cards.

The clock signal coming from PAD-C3 of the DIRECTV receiver's access card slot is the primary reference for glitch timing. It is used as the clock reference for the Terminator P.S.B.'s onboard Atmel microprocessor, which causes the microprocessor to run in precise lockstep with the inserted access card.

There are no switches, jumpers or connectors available on the Terminator P.S.B. that could be used to instruct it to apply a glitch at a user-specified time. The timing of the glitch is therefore controlled *a-priori*, exclusively, and with high precision by the instructions programmed into the Atmel microprocessor by the designers of the Terminator P.S.B.


**Evidence: The Terminator P.S.B. cannot communicate with an inserted access card.**

As shown by the schematic diagram, the Terminator P.S.B. lacks any connection to the access card's IO line. As a result, it cannot communicate with either the DIRECTV receiver or the inserted access card. As designed, the Terminator P.S.B. can only manipulate the voltage and reset lines going to the access card.

Respectfully submitted,

_____

Bill Gatliff

**Evidence: The Terminator P.S.B. does not allow you to adjust glitch timing.**

A successful glitch must be applied at a precise moment during operation of the inserted access card, corresponding to a particular instruction in the access card's internal code that must be skipped or caused to malfunction. While the voltage level of a glitch might need to be adjusted between access cards due to normal manufacturing variations, the codes present in a targeted class of DIRECTV access cards are identical, meaning that the time the glitch must be applied is exactly the same for that entire family of access cards.

The clock signal coming from PAD-C3 of the DIRECTV receiver's access card slot is the primary reference for glitch timing. It is used as the clock reference for the Terminator P.S.B.'s onboard Atmel microprocessor, which causes the microprocessor to run in precise lockstep with the inserted access card.

There are no switches, jumpers or connectors available on the Terminator P.S.B. that could be used to instruct it to apply a glitch at a user-specified time. The timing of the glitch is therefore controlled *a-priori*, exclusively, and with high precision by the instructions programmed into the Atmel microprocessor by the designers of the Terminator P.S.B.

**Evidence: The Terminator P.S.B. cannot communicate with an inserted access card.**

As shown by the schematic diagram, the Terminator P.S.B. lacks any connection to the access card's IO line. As a result, it cannot communicate with either the DIRECTV receiver or the inserted access card. As designed, the Terminator P.S.B. can only manipulate the voltage and reset lines going to the access card.

Respectfully submitted,

Bill Gatliff



# Expert Report: Shanty Bootloader

by David Simon

February 6, 2004

## Summary

After carefully analyzing and testing a Shanty Bootloader device and reviewing relevant documents, I have concluded that the Shanty Bootloader device was designed for the purpose of circumventing DIRECTV's conditional access controls.

This conclusion is based on my findings that:

1. The Shanty Bootloader device can, in fact, be used to circumvent DIRECTV's conditional access controls.
2. The Shanty Bootloader device was marketed by Shanty alongside other products whose purpose was to circumvent DIRECTV's conditional access controls.
3. Legitimate uses of the Shanty Bootloader device are implausible.

## Background

On January 29, 2004, I received a device described as a "Shanty Bootloader" from DIRECTV for analysis. I was asked to review the design of this device and render my independent opinion as to its nature.

To perform my analysis, I carefully examined the design of the hardware through visual and electrical inspection, and I researched potential uses of the device on the Web. In some of this work, I have been assisted by Richard Steinberg, also of Octave Software Group, Inc.

## Evidence and Analysis

**Evidence: The Shanty Bootloader is designed to be inserted into a smartcard terminal and has an internal smartcard slot into which an ISO 7816 smartcard can be inserted.**

The Shanty Bootloader is shown in Figure 1 and Figure 2. It is a small electrical device featuring a set of contacts that mate with those found in a smartcard terminal, a slot for a smartcard, an Atmel AT90S1200 microcontroller, and a few other components.

Shanty Bootloader                                February 6, 2004



*Figure 1  A closeup of the Shanty Bootloader (front)*

Figure 1 shows that on the front side of the device there is a smartcard slot into which a DIRECTV P2/H access card has been inserted.  There are various components mounted on this side of the board underneath the smartcard slot.  Text on the silkscreening includes:

- Information about how to position a jumper to power the device from the smartcard terminal into which it is inserted or from an external power supply.

- Information about how to position a set of switches to control the "glitch voltage."

- The text "PF-B94V-0"

In addition the text "INSERT THIS SIDE UP" appears in copper.

Shanty Bootloader                                                February 6, 2004



*Figure 2  A closeup of the Shanty Bootloader (back)*

Figure 2 shows the back side of the device.  Note at the left end a set of contacts of the appropriate size, shape, and location to mate with an ISO 7816-compliant smartcard terminal.  The text "V16" appears on the back of the circuit board in copper.

**Evidence: The Shanty Bootloader device is apparently intended to be inserted into DIRECTV receivers.**

Figure 3 shows the Shanty Bootloader in use.

Page 4 of 17

Shanty Bootloader _____ February 6, 2004



*Figure 3  A Shanty Bootloader in use*

The side of the Shanty Bootloader device *opposite* the ISO 7816 contacts by which it connects to a smartcard terminal is labeled "INSERT THIS SIDE UP." This labeling is correct for a device intended to be inserted into a DIRECTV receiver; all of the DIRECTV receivers with which I am familiar are designed to accept smartcards inserted with contacts down. However, other smartcard terminals I am aware of are designed to accept smartcards inserted with contacts up. Following the "INSERT THIS SIDE UP" directions therefore only works if the Shanty Bootloader device is inserted into a DIRECTV receiver.

**Evidence: The Shanty Bootloader contains circuitry designed to allow the external smartcard terminal to communicate with a smartcard in the Shanty Bootloader's smartcard slot, in particular DIRECTV P2/H access cards disabled by electronic counter-measures.**

Figure 4 is a partial electrical schematic for the Shanty Bootloader. We produced this schematic by examination of the actual Shanty Bootloader.



*Figure 4  Partial schematic diagram for the Shanty Bootloader*

Page 6 of 17

During operation of the Shanty Bootloader, electrical power and signals coming from the smartcard terminal enter the device via the connections labeled IRD-VCC, IRD-RST, IRD-CLK, and IRD-IO on the left side of the schematic diagram. IRD-CLK and IRD-IO are connected directly to the inserted smartcard through the connections labeled CAM-CLK and CAM-IO on the right side of the schematic diagram. As long as the Shanty Bootloader device delivers between 4.5 and 5.5 volts to CAM-VCC, and as long as the device holds the CAM-RST line high, the connection between IRD-IO and CAM-IO allows communications to flow directly from the smartcard terminal to the smartcard installed in the Shanty Bootloader and back. If the Shanty Bootloader is installed in a DIRECTV receiver and a P2/H card installed in the Shanty Bootloader, the DIRECTV receiver and the P2/H card can communicate normally.

**Evidence: The Shanty Bootloader contains specialized circuitry that is useful for delivering nonstandard signals to an inserted smartcard; this circuitry has no useful, standard purpose.**

The ISO 7816 standard specifies the signals that should be used to communicate with smartcards and the voltages on those signals. The Shanty Bootloader contains a special circuit, also shown in Figure 4, that violates that specification. The special circuit allows the Shanty Bootloader to deliver a voltage in violation of the ISO 7816 standard to the connection that powers the smartcard ("CAM-VCC" on the schematic) for a short period of time. The violation of the CAM-VCC signal specifications is often referred to as a "glitch."

The Atmel AT90S1200 microcontroller controls the special circuit through the signal labeled PB2. When the microcontroller sets the PB2 signal to high, the 7407 parts are inactive, and the voltage that is delivered to CAM-VCC is the 4.5 to 5.5 volts provided by the smartcard terminal into which the Shanty Bootloader is inserted. The resistor labeled R1 in the schematic will have a negligible effect upon the voltage delivered to CAM-VCC.

When the Atmel microcontroller sets the PB2 signal to low, the parts labeled "7407" on the schematic drive their outputs to 0 volts. The resistors labeled R1 through R6 will then cause the voltage at CAM-VCC to be between about 2 and about 3 volts, well below the 4.5 – 5.5 volt range specified in ISO 7816. The setting of the switches selects the actual voltage.

The presence of this special circuit causes the Shanty Bootloader to violate the ISO 7816 standard, and this circuit has no other purpose. There is no behavior specified for ISO 7816 smartcards in the presence of this violation.

**Evidence: While using the Shanty Bootloader, I observed the device violate the ISO 7816 specification as discussed above.**

I used an oscilloscope to observe the behavior of the Shanty Bootloader inserted into a DIRECTV receiver (Hughes Network Systems model HIRD-E1, *"Silver Edition")*. I performed no prior setup or configuration steps to the Shanty Bootloader before inserting it into the DIRECTV receiver.

The oscilloscope screen capture in Figure 5 shows the output of the special circuit during one test. The "trigger" that I set up to cause the oscilloscope to capture and display the voltage was the short drop in the voltage that characterizes a glitch. The trace shows the CAM-VCC signal supplied to the access card. According to the ISO 7816 standard for smartcards, the VCC signal should remain within the 4.5-5.5V range for the entire time that the card is inserted. In Figure 5 the Shanty Bootloader has changed the voltage on the VCC signal from about 4.9 volts to about 2.4 volts for a period of about 2.64 microseconds.

Shanty Bootloader                                              February 6, 2004



*Figure 5  The Shanty Bootloader device places precisely timed glitches like these on VCC*

The oscilloscope screen capture in Figure 5 above shows the output of the special circuit when the voltage selector switches are in the setting recommended on the text printed on the board (switches 1 and 2 are on; 3 and 4, off).  The oscilloscope screen capture in Figure 6 shows the output of the special circuit when the voltage selector switches are all on.  In this case, the glitch voltage is about 1.8 volts but the glitch is otherwise similar to that shown in Figure 5.



*Figure 6 The user can control the voltage of the Shanty Bootloader device glitches.*

**Analysis: The Shanty Bootloader uses the violation of the ISO 7816 specification to circumvent DIRECTV access controls.**

The glitch delivered by the Shanty Bootloader causes a DIRECTV P2/H access card disabled by an electronic counter-measure to malfunction in a way that it circumvents the card's conditional access controls. To do this, the glitch must occur at a precise time to cause the P2/H access card to malfunction. To accomplish this timing, the Shanty Bootloader design connects the clock ("IRD-CLK") signal to the XTAL1 input of the Atmel microcontroller in the Shanty Bootloader, which makes the microcontroller run at exactly the same speed as the microprocessor contained in the DIRECTV access card. The Atmel microcontroller also controls the reset ("CAM-RST") signal to the inserted smartcard. When the CAM-RST line is changed from low to high, the microcontroller in the DIRECTV access card starts its program from the beginning.

After it has been installed in a DIRECTV receiver, the Shanty Bootloader sets the CAM-RST signal high, starting the program in the DIRECTV access card, waits the appropriate period of time, and applies the glitch. The timing corresponds to the location of a particular instruction in the access card's internal program that must be forced to malfunction in order to circumvent security.

The startup part of the internal programs in DIRECTV access cards targeted by devices like the Shanty Bootloader are all identical, meaning that the instruction that must be caused to malfunction ("glitched") always occurs after the same delay after CAM-RST has been set high.

The inclusion of the specialized glitching circuitry in this device has no purpose other than to violate the ISO7816-3 specification in very specific ways at very specific times. A smartcard subjected to glitches can be expected to malfunction in some way. It is, in fact, a specific kind of malfunction in the DIRECTV access cards that the Shanty Bootloader device is designed to cause and then exploit.

**Evidence: Attempts to operate a smartcard outside the specified electrical ranges are a known form of attack on smart cards.**

In 1998, [Guthery] defined an "induced error attack" as follows:

"An attack on a smart card's security system... by subjecting the card to unusual environmental conditions such as temperature, voltage, microwaves, radiation, and so on." [p. 325]

[Rankl] describes the sort of thing that might happen when a DIRECTV access card is subjected to glitching by a Shanty Bootloader device:

"it could for example happen that the program counter becomes unstable when the chip is operated outside of its specified supply voltage range, which in turn could lead to uncontrolled jumps within the program" [pp. 416-417]

There is no legitimate use for glitching circuitry; devices that glitch smartcard voltages are simply designed to circumvent security features of the targeted class of

smartcards via induced error attacks. In the case of the Shanty Bootloader device, the targeted class of smartcards is DIRECTV's P2/H access cards.

**Evidence: A DIRECTV P2/H card that was disabled on Black Sunday behaves differently when installed in a Shanty Bootloader.**

DIRECTV provided to me several P2/H cards that were disabled on Black Sunday. I inserted one of these into a smartcard reader and observed that when the reader applied power to the card, the card did not provide the standard power-up message that all smartcards must provide under the ISO 7816 specification. This failure to provide the power-up message stops all subsequent communications with the card, rendering it useless. Then I inserted the same P2/H card into the Shanty Bootloader and inserted the Shanty Bootloader into the same smartcard reader. In this setup, the card provided the power-up message, and I was subsequently able to communicate with the card. In particular, I was subsequently able to use BasicH, a pirate program that I had previously downloaded from the web. BasicH allows a user to perform various functions associated with DIRECTV piracy, including erasing pay-per-view records, loading new software onto the access card, unmarrying the access card from the set-top box, and so on.

**Evidence: The content of the web site on which the Shanty Bootloader was sold makes clear that its purpose is to circumvent DIRECTV access controls.**

A survey of the June, 2001 Web site SHANTY.COM loaded from www.archive.org shows an advertisement for a "Boot Loader," which claims it is:

> "...designed to bypass boot section of *damaged* smart cards – Allows access to read/write to *damaged* smart cards – **Excellent item to be used with emulation** – The life support of *damaged* smart cards..." [bold in the original; italics mine]

At various times DIRECTV took various "electronic counter-measures" that disabled modified P2/H access cards that were allowing people to steal the DIRECTV signal. On January 21, 2001, "Black Sunday," DIRECTV took a particularly successful electronic counter-measure, which disabled many of these modified P2/H access cards. It appears that the "damage" referred to in the sales pitch above is the disabling

modification made by the Black Sunday ECM, since circumventing that modification is indeed what the Shanty Bootloader does. With a Shanty Bootloader, a person could bring a card disabled on Black Sunday or by one of the other electronic counter-measures back to life and continue to watch DIRECTV without troubling to pay for the service. The first bootloaders appeared for sale shortly after January 21, 2001.

Other products advertised at SHANTY.COM include other known devices for DIRECTV piracy: emulators, unloopers, and dumbmouse reader/writers. In particular, I have analyzed the Shanty Ultimate device and found that it is also a device for DIRECTV piracy. See [SHANUNL].

The SHANTY.COM Web site contains the following disclaimer:

> "Use of these products to defeat the security measures of other individuals or companies is a MISUSE of this product and may be unlawful. Please be aware that you may be held both civilly and criminally responsible if you misuse this product in violation of applicable state or federal law."

It appears that the authors of the SHANTY.COM website were aware that such misuse was a possibility.

Simply the fact that the name of the product is "bootloader" is in itself suspicious. This term was adopted by the community of people stealing DIRECTV signals to mean a particular type of product intended to counter the "Black Sunday" electronic counter measure that DIRECTV took to stop the piracy of its signals.

**Evidence: A typical user cannot modify the basic operation of the Shanty Bootloader.**

All the electrical components in the Shanty Bootloader, including the Atmel microcontroller, are directly soldered to the circuit board. As such, they are not removable without special tools.

The three connections that would in theory allow a user to reprogram the Atmel microcontroller are brought to a header on the Shanty Bootloader. However, without

special equipment, a user cannot use this header. Atmel sells such a piece of specialized equipment, but since the SHANTY.COM website provides no information about that product or about any similar product, I conclude that SHANTY.COM did not anticipate that users would reprogram the Atmel microprocessor. Also, the layout of the header is incorrect for use with the Atmel product. Furthermore, since the Atmel microprocessor in the Shanty Bootloader device is attached to nothing other than the CAM-RST line and the glitching circuit, there is nothing it can be programmed to do other than to glitch.

**Evidence: The Shanty Bootloader cannot communicate with an inserted access card. It is designed only to facilitate glitching.**

The Shanty Bootloader is clearly not intended to provide general smart card capabilities to a user because the Shanty Bootloader design provides no electrical connectors or other convenient means to attach the additional circuitry needed to use those capabilities. In particular the CAM-IO line in the schematic diagram is a potential way for the Atmel microcontroller to communicate with a smartcard inserted in the Shanty Bootloader. However, there is no connection between the CAM-IO line and the Shanty Bootloader's Atmel microcontroller.

**Evidence: There is no reliable behavior for smartcards in the face of violations of the ISO 7816 standard. In particular, there is no reliable behavior if VCC is not at the appropriate voltages.**

The ISO 7816 standard is silent on the subject of what behavior is expected of a smartcard if the terminal into which it is placed does not conform to the specification. The actual behavior of a microprocessor-based smartcard such as the DIRECTV cards under such circumstances depends upon what the microprocessor does. For the most part, microprocessor manufacturers do not define this behavior.

Therefore, no reliable behavior can be expected from a smartcard when a glitch such as that provided by the Shanty Bootloader is applied, absent knowledge of a specific smartcard and its programming.

**Analysis: Smartcard glitching is used for no legitimate purposes, because there are easier and more reliable ways to accomplish anything that can be done with glitching.**

Here are a few examples:

- The microprocessor in a smartcard might stop functioning when a glitch occurs and then restart the program from the beginning when the glitch ends. Some microprocessors do this reliably; others don't. If one wants to restart the program running in a smartcard from the beginning, ISO 7816 specifies an easy, universal, reliable way to accomplish this with the RST ("reset") signal. Glitching is a poor alternative.

- The microprocessor in a smartcard might skip one or more instructions when a glitch occurs and continue with the subsequent instructions. Again, some microprocessors do this reliably; others don't. If a smartcard distributor wants these instructions to be skipped, either some of the time or all of the time, changing the software in the smartcard is easier and cheaper than glitching.

- The microprocessor in a smartcard might go to some particular instruction in the program when it is glitched and execute the subsequent instructions from there. The particular instruction may be the same one after each glitch or a different one each time. Again, if a smartcard distributor wants the microprocessor to execute a particular sequence of instructions, the software can be changed to accomplish this.

**Evidence: The Shanty Bootloader has no general uses. It is designed solely for glitching a smartcard, in particular the DIRECTV P2/H card.**

There are three situations in which a smartcard might cease to function but subsequently be brought back to life with a glitching device such as the Shanty Bootloader. First, the smartcard might fail after it has been delivered to a customer for a reason unforeseen by the manufacturer or distributor. In this case any reputable outfit

would replace the smartcard at no cost to the customer; the customer would have no reason to incur the expense and inconvenience of using the Shanty Bootloader.

Second, the smartcard might disable itself intentionally. In this case using the Shanty Bootloader would constitute an intentional circumvention of the appropriate behavior of the smartcard. For example, if a smartcard disabled itself because it detected that it had been tampered with, using the Shanty Bootloader would constitute a circumvention of a security feature of the smartcard

Third, a smartcard might fail during development because of a programming error. In this case the Shanty Bootloader would be useful only in the extremely limited situations outlined above. In my experience most product development operations would discard the failed smartcard. The cost to replace the smartcard is tiny compared to the engineering cost to determine whether or not a device such as the Shanty Bootloader would work, the cost of the device itself, and the ongoing inconvenience of having to use it ever afterwards in conjunction with the smartcard.

## Documents Reviewed

During my analysis of the Shanty Bootloader device, I reviewed and had at hand the following documents:

[AVR2313]    "Atmel AT90S2313 8-bit AVR Microcontroller with 2K Bytes of In-System Programmable Flash" (datasheet) Atmel. June 2002.

[AVRISP]    "AVR In-System Programmer User Guide" (data sheet) Atmel  2001

[Guthery]    Guthery, Scott B. and Timothy M. Jurgensen.  Smart Card Developer's Kit. Macmillan Technical Publishing. Indianapolis, 1998.

[ISO7816-3]    ISO/IEC 7816-3: Electronic Signals and Transmission Protocols. International Standards Organization. Geneva, 1997.

[Rankl]      Rankl, Wolfgang and Wolfgang Effing.  Smart Card Handbook, Second
              Edition.  John Wiley & Sons.  2000.  ISBN 0-471-98875-8

[SHANUNL]  Simon, David, "Expert Report: Shanty Ultimate," February 6, 2004

## Signature

Respectfully submitted,

_____      _____      _____

Author's Name (Printed)          Signature                        Date

[Rankl]    Rankl, Wolfgang and Wolfgang Effing.  Smart Card Handbook, Second
Edition.  John Wiley & Sons.  2000.  ISBN 0-471-98875-8

[SHANUNL]  Simon, David, "Expert Report: Shanty Ultimate," February 6, 2004

## Signature

Respectfully submitted,

DAVID E SIMIN _____    2/6/04
Author's Name (Printed)              Signature                Date

# Netrino

## STATEMENT OF AGREEMENT

I, _MICHAEL BARR_ , have read the expert report by Netrino

expert _DAVID SIMON_ that is dated ___2/6/04___ and which

describes the primary expert's findings and conclusions about the device known as a

_SHANTY BOOTLOADER_ . Based on my examination of the

device at issue and other similar devices, I am in agreement with the analysis and

opinions contained in the above described report. I adopt all of the opinions of the

report as my own.


_____    ___2/6/04___
Signature    Date

STATE OF CALIFORNIA        §
                           §
COUNTY OF LOS ANGELES  §

### BUSINESS RECORD AFFIDAVIT OF DIRECTV

BEFORE ME, the undersigned authority, on this day personally appeared Carol Fong-Hilton, who is personally known to me, and being first duly sworn according to law, upon her oath, deposed and said:

My name is Carol Fong-Hilton.  I am over the age of eighteen (18) years of age and reside in Los Angeles County, California.   I am currently employed as a Supervisor in DIRECTV's End User Development Group.  My responsibilities include supporting DIRECTV's anti-piracy efforts. I have been employed by DIRECTV for over 4 years.   I am a custodian or other qualified witness; I have personal knowledge regarding this matter, and, if called, would testify as follows.

### DIRECTV'S ACCOUNT RECORDS ARE TRUE AND CORRECT

True and correct copies of the DIRECTV account records identified for Aaron Voreis are attached hereto and incorporated herein by reference as Exhibit 1. Aaron Voreis' account number was 015023909.  The pages of business records attached as Exhibit 1 were kept in the course of the regularly conducted activity by DIRECTV. These business records were made in the regular course of the business of DIRECTV as a regular practice.  It is in the regular course of business of DIRECTV for an employee or representative of DIRECTV with personal knowledge of the acts, events, statements,



conditions, or business studies, to make the aforementioned records or to transmit information thereof to be included in such business records.    The attached business records were made at or near the time of the occurrences of the matters set forth by, or from information transmitted by, a person with knowledge of those matters or from information entered as part of DIRECTV's automated system.    These business records were then transmitted to and stored and kept in the custody of DIRECTV and remain records of DIRECTV.  The Attached records are exact duplicates of the original records.

FURTHER, AFFIANT SAITH NOT.

EXECUTED ON THIS ____3____ DAY OF JUNE, 2004.

_____
Carol Fong-Hilton

**SUBSCRIBED AND SWORN** TO BY _Carol Fong-Hilton_, BEFORE ME, THE UNDERSIGNED AUTHORITY ON THIS _3_ DAY OF JUNE, 2004.

_____
Notary Public in and for
The State of California

WENDY PAOLA GOMEZ-CASTILLO
Commission # 1452309
Notary Public - California
Los Angeles County
My Comm. Expires Nov 21, 2007

ACCOUNT NUMBER = 015023909


```
 DTV                           Show Subscriber                    06/20/
03 10:46
 Acct: 015023909 Name: AARON VOREIS                         Status:
ACTV

 Business Name:  N                                  Cust Seg: 2 -
1-2-5
 Name:          AARON         VOREIS
                                                   Amount Due:
.00
 Address:       40       CASA GRANDE               Past Due:
.00
                                                   PPV Limit
60.00
 Apartment No:                                     Comments:
5
 Zip Code:      78521-272340
 City:          BROWNSVILLE                 *State/Prov: TX
*County:        CAMERON         *Country: USA    *Account Type: REG

 Home Phone:    956 546-9188            Use Alt Mailing Address: N
 Bus. Phone:             Ext:             In Broadcast Area:      Y
                                          *Cable Status:          C
*Id 1:
*Id 2:                                 Sell Name To Mailing List: Y
                                       Receive Promotional Calls: Y
 Password:                             Receive Promotional Mail:  Y
 Chain/Dealer: CIRCUIT CITY SUPERSTORE/CIRCUIT CITY
 Services           DSS Access Card    Comments          Change
 CMS Card Chg Hist  Billing Ledger     Bill Image        Select New
Account
```


```
 DTV                           Show Subscriber                    06/20/
03 10:46
 Acct: 015023909 Name: AARON VOREIS                         Status:
ACTV

 Use Alternate Mailing Address:        N
```



```
                    Name:
                    Address:

                    City:
                    *State/Prov:
                    Zip Code:                          *Country:



 Use Credit Card:  N                 Use Electronic Funds Transfer:
N
*Credit Card Type:                   Bank ID Number:
 Credit Card Num:                    Bank Acct Number:
 Expiration Date:                    Verify Received:
                                     EFT Transmission Days:
                                     EFT Due Date:
                    *Statement Option: Y
```

| Services | DSS Access Card | Comments | Change |
|---|---|---|---|
| Sub Demographics | Billing Ledger | Bill Image | Select New |
| Account | | | |

```
PAGE BREAK
 DTV                        Show Subscriber                06/20/
03 10:46
 Acct: 015023909 Name: AARON VOREIS                        Status:
ACTV

 Create Date:            11/06/1999   Subscriber Acct Ind: 04
 Activate Date:          11/06/1999   Bill Cycle Day:      06
                                      Service Cycle Day:   06
 Last Modified Date:     06/07/2003   Last Billed Date:    06/06/2003
 Last Modified By:       SELFCARE     Last Bill Due Date:  06/26/2003
                                      Last Bill Amount:         61.19
 Service Suspend Date:                Last Payment Date:   06/17/2003
 Disconnect Date:                     Amt Due At Last EOM:      0.00
 Disconnect Reason Code:

                                      Tax Geo Code:        44-061-0410
 Cutoff Date:                         Time Zone:           C
 Cutoff Extended By:                  Daylight Savings:    Y
 Cutoff Level:                        Census Tract:        013104
 Non Pay Code:                        Census Block Group:  1
 Write-Off Amount:                    Latitude:              259401 N
 Dealer Acct Type:       CE           Longitude:             974764 W
 Created By Dealer:      Y 001679881 CIRCUIT CITY
 Chain Number/Name:      00009  CIRCUIT CITY SUPERSTORE
 Services            DSS Access Card    Comments          Change
```

Sub Demographics    Billing Ledger     Bill Image        Select New
Account

DTV                        Show Services                    06/20/
03 10:46
 Acct No: 015023909     Name: AARON VOREIS              Status:
ACTV
 DSS Access Card: 000321781353              Account Balance:
0.00

->
                                 Service    Tax     Total Tax
 Service Cd       Description     Amount    Amount   Amount Code
Status
B000005075 Please see the         0.00      0.00     0.00
ACTV -
P000000358 TOTAL CHOICE          33.99      2.12    36.11 S
ACTV |
P000002141 STARZ!                12.00      0.75    12.75 S
ACTV |
P000001501 SHOWTIME              15.00      0.94    15.94 S
DISC |
P000001551 PLATINUM REWARDS       0.00      0.00     0.00
DISC |
P000001853 Minimum Service        5.00      0.31     5.31 S
DISC |
PAGE BREAK
 DTV                        Comments List                   06/20/
03 10:46

 Acct No:  015023909    Name: AARON VOREIS                Status:
ACTV

 Cmt       Imp
 Type Code Flg         Subject          Date     Time       CSR ID
 ACCT 1250 N  CHARGES-NEEDED EXPLANATION   09/14/2002 09:23 AM
OSIJOHNSONM  -
 ACCT 1261 N  Network-Waiver              11/03/2000 01:06 AM CHURNESS
|
 ACCT 1261 N  Network-Waiver              09/24/2000 09:12 AM 10017223
|
 ACCT 1250 N  CHARGES-NEEDED EXPLANATION  08/03/2000 07:43 PM 10017602

```
|
 ACCT 1250 N  CHARGES-NEEDED EXPLANATION      04/10/2000 07:43 PM 10014253
|
```

```
 DTV                        Show Comments                    06/20/
03 10:46

 Acct No:     015023909 Name: AARON VOREIS                        Status:
ACTV
*Comment Type: ACCT    *Reason Code: 1250  CHARGES-NEEDED EXPLANATION
*DSS Card:    000321781353 Date: 09/14/2002 Time: 09:23 AM CSR ID:
OSIJOHNSONM
 COMMENT:

+----------------------------------------------------------------------
---+
 | cust pd the bif
|
 |
|
 |
|
 |
|
 |
|
 |
|
 |
|
 |
|
 |
|
 |
|
 |
|

+----------------------------------------------------------------------
---+
```

```
PAGE BREAK
 DTV                          Show Comments                  06/20/
03 10:46

 Acct No:    015023909 Name: AARON VOREIS                      Status:
ACTV
*Comment Type: ACCT    *Reason Code: 1261  Network-Waiver
*DSS Card:    000321781353 Date: 11/03/2000 Time: 01:06 AM CSR ID:
CHURNESS
 COMMENT:

+----------------------------------------------------------------------
---+
 |DNS waiver status for address and affiliates listed below:
 |
 |40      CASA GRANDE
 |
 |BROWNSVILLE, TX 78521
 |
 |KGBT - WAIVER DENIED
 |
 |KRGV - WAIVER DENIED
 |
 |XHFO - WAIVER DENIED
 |
 |KVEO - WAIVER DENIED
 |
 |
 |
 |
 |
 |
 |
 |
 |
 |
 |

+----------------------------------------------------------------------
---+
```

```
 DTV                          Show Comments                        06/20/
03 10:46

  Acct No:    015023909 Name: AARON VOREIS                         Status:
ACTV
*Comment Type: ACCT    *Reason Code: 1261  Network-Waiver
*DSS Card:    000321781353 Date: 09/24/2000 Time: 09:12 AM CSR ID:
10017223
 COMMENT:

+-------------------------------------------------------------------------
---+
 |eligible for none
|
 |
|
 |aaron vories
|
 |40 casa grande
|
 |brownsville tx 78521
|
 |
|
 |submitted waivers for abc, cbs, nbc, and fox
|
 |
|
 |
|
 |
|
 |
|
 |
|
 |
|

+-------------------------------------------------------------------------
---+
PAGE BREAK
 DTV                          Show Comments                        06/20/
03 10:46

  Acct No:    015023909 Name: AARON VOREIS                         Status:
```

ACTV
*Comment Type: ACCT     *Reason Code: 1250  CHARGES-NEEDED EXPLANATION
*DSS Card:    000321781353 Date: 08/03/2000 Time: 07:43 PM CSR ID:
10017602
 COMMENT:

+--------------------------------------------------------------------
---+
 |cust has been charged for showtime for 3 months after it was given to him
fr |
 |ee for one month. cust wanted 45. but we agreed on the amount of 43.50.
cred |
 |ited his acct for cust satifaction.
 |
  |
 |
  |jarom11m53
 |
  |
 |
  |
 |
  |
 |
  |
 |
  |
 |
  |
 |
  |
 |
  |
 |

+--------------------------------------------------------------------
---+


 DTV                    Show Comments              06/20/
03 10:47

```
 Acct No:     015023909 Name: AARON VOREIS                          Status:
ACTV
*Comment Type: ACCT     *Reason Code: 1250  CHARGES-NEEDED EXPLANATION
*DSS Card:    000321781353 Date: 04/10/2000 Time: 07:43 PM CSR ID:
10014253
 COMMENT:

+---------------------------------------------------------------------------
---+
 |SHOWTIME OFFER/1 MONTH/LATE FEE/DID NOT GET BILL FOR TWO MONTHS
 |
  |
 |
 |JESSE/TX
 |
  |
 |
  |
 |
  |
 |
  |
 |
  |                                                                    .
 |
  |
 |
  |
 |
  |
 |
  |
 |

+---------------------------------------------------------------------------
---+
PAGE BREAK
PAGE BREAK
 DTV                          DSS Access Card                   06/20/
03 10:47
 Acct:  15023909 Name: AARON VOREIS                             Status:
ACTV

 DSS Access Card Information:
   *DSS Access Card ID: 000321781353     Pay-Per-View Information:
    Status:           ACTV                 Allow OPPV:       Y
```

```
        Indicator:                          Allow IPPV:           N
        Location:           LVRM            Purchase Period:      M
       *Rating Code:        X               Purchase Limit:
0.00
        Restricted:         N               Callback Day:         28
        Installer ID:       S               Last Callback:
        Card Type:          P               Callback Thresh:
70.00
        Phone Connection:   N           IRD Information:
        Mirror:             N               Serial No:      938356867
        Charge Mirror Fee:  N              *Manufacturer: RCA
        Charge Fee Annually:               *Model Number: DRD222RD
        Pers. Region Bits:                  RID:           0
                                            IRD ID:
        Parent CSS:         1 DTV       Assign Satellite IDs:
        CAM Period ID:      03              Software Ver:




        Activation Date:    11/06/1999      Callback Phone No:
        CAMC Subscr ID:      11419625
        Old DSS ACC ID:
        Replace Date:
        Disconnect Date:
        Security Rating:    0




        Last Modified Date: 03/01/2003
        Last Modified By:   AUTO_REIN


PAGE BREAK
DTV                         Show Service History            06/20/
03 10:47
 Acct No: 015023909    Name: AARON VOREIS               Status:
ACTV

 Action    Date   Time     Service       DSS Card   Alt Acct No    CSR
ID

Create  11/06/99 18:43  PLAT RWRDS      000321781353        10012956

Create  11/06/99 18:43  TOTAL CHOICE    000321781353        10012956
```

```
Disconn 01/06/00 00:00  PLAT RWRDS      000321781353              EXPIRED

Create  04/10/00 18:41  SHOW            000321781353              10014253

Create  05/04/00 01:25  SHOW            000321781353              BILLING

Disconn 05/04/00 01:25  SHOW            000321781353              BILLING

Disconn 08/03/00 18:32  SHOW            000321781353              10017602

Create  05/20/02 17:12  MINSVC          000321781353
SVC_FUT_BAT
Disconn 05/21/02 03:17  TOTAL CHOICE    000321781353              NONPAY

Reinste 05/21/02 16:07  TOTAL CHOICE    000321781353              AUTO_REIN

Disconn 05/21/02 16:07  MINSVC          000321781353              AUTO_REIN

Create  07/20/02 09:12  MINSVC          000321781353
SVC_FUT_BAT
Disconn 07/21/02 03:23  TOTAL CHOICE    000321781353              NONPAY

Reinste 08/01/02 20:16  TOTAL CHOICE    000321781353              AUTO_REIN

Disconn 08/01/02 20:16  MINSVC          000321781353              AUTO_REIN

Create  11/20/02 17:03  MINSVC          000321781353
SVC_FUT_BAT
Disconn 11/21/02 03:35  TOTAL CHOICE    000321781353              NONPAY

Reinste 11/22/02 22:30  TOTAL CHOICE    000321781353              AUTO_REIN

Disconn 11/22/02 22:30  MINSVC          000321781353              AUTO_REIN

Create  02/21/03 03:15  MINSVC          000321781353              BILLNONPAY

Disconn 02/21/03 03:15  TOTAL CHOICE    000321781353              NONPAY

Reinste 03/01/03 10:48  TOTAL CHOICE    000321781353              AUTO_REIN

Disconn 03/01/03 10:48  MINSVC          000321781353              AUTO_REIN

Create  05/08/03 17:47  STARZ!2         000321781353              Selfcare

Create  06/06/03 01:40  MESSAGE         000321781353
SVC_FUT_BAT
```

```
PAGE BREAK
 DTV                              Billing Ledger                  06/20/
03 10:47
 Acct No: 015023909    Name: AARON VOREIS                        Status:
ACTV
```

->

| Date | Service | Code | From | To | Tax | Amount |
|------|---------|------|------|-----|-----|--------|
| Balance | | | | | | |
| 11/06/99 | TOTAL CHOICE | P000000358 | 11/06/99 | 12/05/99 | 1.87 | 29.99 |
| 31.86 | | | | | | |
| 11/06/99 | PLAT RWRDS | P000001551 | 11/06/99 | 01/05/00 | | |
| 31.86 | | | | | | |
| 11/07/99 | First Bill | | 11/06/99 | 11/26/99 | | |
| 31.86 | | | | | | |
| 12/04/99 | TOTAL CHOICE | P000000358 | 12/06/99 | 01/05/00 | 1.87 | 29.99 |
| 63.72 | | | | | | |
| 12/04/99 | Monthly Bill | | 12/03/99 | 12/23/99 | | |
| 63.72 | | | | | | |
| 12/17/99 | Payment - Check | | | | | -63.72 |
| 0.00 | | | | | | |
| 01/04/00 | TOTAL CHOICE | P000000358 | 01/06/00 | 02/05/00 | 1.87 | 29.99 |
| 31.86 | | | | | | |
| 01/04/00 | Monthly Bill | | 01/03/00 | 01/23/00 | | |
| 31.86 | | | | | | |
| 02/04/00 | Late Fee | L000000051 | 02/03/00 | | .10 | 1.59 |
| 33.55 | | | | | | |
| 02/04/00 | TOTAL CHOICE | P000000358 | 02/06/00 | 03/05/00 | 1.87 | 29.99 |
| 65.41 | | | | | | |
| 02/04/00 | Monthly Bill | | 02/03/00 | 02/23/00 | | |
| 65.41 | | | | | | |
| 02/09/00 | Payment - Check | | | | | -31.86 |
| 33.55 | | | | | | |
| 03/04/00 | Late Fee | L000000051 | 03/03/00 | | .11 | 1.68 |
| 35.34 | | | | | | |
| 03/04/00 | TOTAL CHOICE | P000000358 | 03/06/00 | 04/05/00 | 1.87 | 29.99 |
| 67.20 | | | | | | |
| 03/04/00 | Monthly Bill | | 03/03/00 | 03/23/00 | | |
| 67.20 | | | | | | |
| 03/06/00 | Payment - Check | | | | | -33.00 |
| 34.20 | | | | | | |
| 04/04/00 | Late Fee | L000000051 | 04/03/00 | | .11 | 1.71 |
| 36.02 | | | | | | |
| 04/04/00 | TOTAL CHOICE | P000000358 | 04/06/00 | 05/05/00 | 1.87 | 29.99 |
| 67.88 | | | | | | |
| 04/04/00 | Monthly Bill | | 04/03/00 | 04/23/00 | | |

```
67.88
04/10/00  Payment - CCard                                             -67.88
0.00
04/10/00  SHOW            P000001501 04/10/00 05/09/00
0.00
05/04/00  SHOW            P000001501 05/10/00 06/05/00     .84    13.50
14.34
05/04/00  TOTAL CHOICE    P000000358 05/06/00 06/05/00    1.87    29.99
46.20
05/04/00  Monthly Bill               05/03/00 05/23/00
46.20
06/04/00  Late Fee        L000000051 06/03/00              .14     2.31
48.65
06/04/00  SHOW            P000001501 06/06/00 07/05/00     .94    15.00
64.59
06/04/00  TOTAL CHOICE    P000000358 06/06/00 07/05/00    1.87    29.99
96.45
06/04/00  Monthly Bill               06/03/00 06/23/00
96.45
06/30/00  Payment - Check                                            -46.20
50.25
07/04/00  Late Fee        L000000051 07/03/00              .16     2.51
52.92
07/04/00  SHOW            P000001501 07/06/00 08/05/00     .94    15.00
68.86
07/04/00  TOTAL CHOICE    P000000358 07/06/00 08/05/00    1.87    29.99
100.72
07/04/00  Monthly Bill               07/03/00 07/23/00
100.72
07/20/00  Payment - Check                                            -46.20
54.52
08/03/00  Disconnect Adj  P000001501 08/03/00 08/05/00   -0.09    -1.50
52.93
08/03/00  PPV CR          P000001501 07/06/00 08/05/00   -0.94   -15.00
36.99
08/03/00  PPV CR          P000001501 07/06/00 08/05/00   -0.94   -15.00
21.05
08/03/00  PPV CR          P000001501 07/06/00 08/05/00   -0.84   -13.50
6.71
08/03/00  PPV CR          P000001501 07/06/00 08/05/00     .09     1.50
8.30
08/03/00  PPV CR          P000001501 07/06/00 08/05/00   -0.09    -1.50
6.71
08/04/00  TOTAL CHOICE    P000000358 08/06/00 09/05/00    1.87    29.99
38.57
08/04/00  Monthly Bill               08/03/00 08/23/00
```

```
38.57
08/24/00  Payment - Check                                             -38.57
0.00
09/04/00  TOTAL CHOICE    P000000358 09/06/00 10/05/00   2.00    31.99
33.99
09/04/00  Monthly Bill               09/03/00 09/23/00
33.99
10/04/00  Late Fee        L000000051 10/03/00              .11     1.70
35.80
10/04/00  TOTAL CHOICE    P000000358 10/06/00 11/05/00   2.00    31.99
69.79
10/04/00  Monthly Bill               10/03/00 10/23/00
69.79
11/04/00  Late Fee        L000000051 11/03/00              .22     3.49
73.50
11/04/00  TOTAL CHOICE    P000000358 11/06/00 12/05/00   2.00    31.99
107.49
11/04/00  Monthly Bill               11/03/00 11/23/00
107.49
11/20/00  Payment - Check                                            -107.49
0.00
12/04/00  TOTAL CHOICE    P000000358 12/06/00 01/05/01   2.00    31.99
33.99
12/04/00  Monthly Bill               12/03/00 12/23/00
33.99
12/15/00  Payment - Check                                             -33.99
0.00
01/04/01  TOTAL CHOICE    P000000358 01/06/01 02/05/01   2.00    31.99
33.99
01/04/01  Monthly Bill               01/03/01 01/23/01
33.99
01/30/01  Payment - Check                                             -33.99
0.00
02/04/01  TOTAL CHOICE    P000000358 02/06/01 03/05/01   2.00    31.99
33.99
02/04/01  Monthly Bill               02/03/01 02/23/01
33.99
03/03/01  Payment - Check                                             -33.99
0.00
03/04/01  TOTAL CHOICE    P000000358 03/06/01 04/05/01   2.00    31.99
33.99
03/04/01  Monthly Bill               03/03/01 03/23/01
33.99
03/25/01  Payment - Check                                             -33.99
0.00
04/04/01  TOTAL CHOICE    P000000358 04/06/01 05/05/01   2.00    31.99
```

```
          33.99
          04/04/01  Monthly Bill                 04/03/01 04/23/01
          33.99
          04/29/01  Payment - Check                                        -33.99
          0.00
          05/04/01  TOTAL CHOICE   P000000358 05/06/01 06/05/01   2.00     31.99
          33.99
          05/04/01  Monthly Bill                 05/03/01 05/23/01
          33.99
          06/04/01  Late Fee       L000000051 06/03/01               .11    1.70
          35.80
          06/04/01  TOTAL CHOICE   P000000358 06/06/01 07/05/01   2.00     31.99
          69.79
          06/04/01  Monthly Bill                 06/03/01 06/23/01
          69.79
          06/13/01  Payment - Check                                        -33.99
          35.80
          07/04/01  Late Fee       L000000051 07/03/01               .11    1.79
          37.70
          07/04/01  TOTAL CHOICE   P000000358 07/06/01 08/05/01   2.00     31.99
          71.69
          07/04/01  Monthly Bill                 07/03/01 07/23/01
          71.69
          07/05/01  Payment - CCard                                        -69.79
          1.90
          08/07/01  TOTAL CHOICE   P000000358 08/06/01 09/05/01   2.00     31.99
          35.89
          08/07/01  Monthly Bill                 08/06/01 08/26/01
          35.89
          08/18/01  Payment - Check                                        -33.99
          1.90
          09/07/01  TOTAL CHOICE   P000000358 09/06/01 10/05/01   2.00     31.99
          35.89
          09/07/01  Monthly Bill                 09/06/01 09/26/01
          35.89
          09/22/01  Payment - Check                                        -35.89
          0.00
          10/07/01  TOTAL CHOICE   P000000358 10/06/01 11/05/01   2.00     31.99
          33.99
          10/07/01  Monthly Bill                 10/06/01 10/26/01
          33.99
          10/23/01  Payment - Check                                        -33.99
          0.00
          11/07/01  TOTAL CHOICE   P000000358 11/06/01 12/05/01   2.00     31.99
          33.99
          11/07/01  Monthly Bill                 11/06/01 11/26/01
```

```
33.99
11/20/01  Payment - Check                                              -33.99
0.00
12/07/01  TOTAL CHOICE    P000000358 12/06/01 01/05/02   2.00    31.99
33.99
12/07/01  Monthly Bill               12/06/01 12/26/01
33.99
12/23/01  Payment - Check                                              -33.99
0.00
01/07/02  TOTAL CHOICE    P000000358 01/06/02 02/05/02   2.00    31.99
33.99
01/07/02  Monthly Bill               01/06/02 01/26/02
33.99
02/07/02  Late Fee        L000000051 02/06/02              .11     1.70
35.80
02/07/02  TOTAL CHOICE    P000000358 02/06/02 03/05/02   2.00    31.99
69.79
02/07/02  Monthly Bill               02/06/02 02/26/02
69.79
02/13/02  Payment - Check                                              -33.99
35.80
03/07/02  Late Fee        L000000051 03/06/02              .11     1.79
37.70
03/07/02  TOTAL CHOICE    P000000358 03/06/02 04/05/02   2.00    31.99
71.69
03/07/02  Monthly Bill               03/06/02 03/26/02
71.69
03/12/02  Payment - Check                                              -35.80
35.89
04/07/02  Late Fee        L000000051 04/06/02              .11     1.79
37.79
04/07/02  TOTAL CHOICE    P000000358 04/06/02 05/05/02   2.00    31.99
71.78
04/07/02  Monthly Bill               04/06/02 04/26/02
71.78
04/11/02  Payment - Check                                              -35.85
35.93
05/07/02  Late Fee        L000000051 05/06/02              .11     1.80
37.84
05/07/02  TOTAL CHOICE    P000000358 05/06/02 06/05/02   2.00    31.99
71.83
05/07/02  Monthly Bill               05/06/02 05/26/02
71.83
05/20/02  MINSVC          P000001853 05/20/02 06/08/02
71.83
05/21/02  LVL1 Disc Adj   P000000358 05/21/02 06/05/02  -1.07   -17.06
```

```
33.99
11/20/01  Payment - Check                                              -33.99
0.00
12/07/01  TOTAL CHOICE   P000000358 12/06/01 01/05/02   2.00    31.99
33.99
12/07/01  Monthly Bill              12/06/01 12/26/01
33.99
12/23/01  Payment - Check                                              -33.99
0.00
01/07/02  TOTAL CHOICE   P000000358 01/06/02 02/05/02   2.00    31.99
33.99
01/07/02  Monthly Bill              01/06/02 01/26/02
33.99
02/07/02  Late Fee       L000000051 02/06/02             .11     1.70
35.80
02/07/02  TOTAL CHOICE   P000000358 02/06/02 03/05/02   2.00    31.99
69.79
02/07/02  Monthly Bill              02/06/02 02/26/02
69.79
02/13/02  Payment - Check                                              -33.99
35.80
03/07/02  Late Fee       L000000051 03/06/02             .11     1.79
37.70
03/07/02  TOTAL CHOICE   P000000358 03/06/02 04/05/02   2.00    31.99
71.69
03/07/02  Monthly Bill              03/06/02 03/26/02
71.69
03/12/02  Payment - Check                                              -35.80
35.89
04/07/02  Late Fee       L000000051 04/06/02             .11     1.79
37.79
04/07/02  TOTAL CHOICE   P000000358 04/06/02 05/05/02   2.00    31.99
71.78
04/07/02  Monthly Bill              04/06/02 04/26/02
71.78
04/11/02  Payment - Check                                              -35.85
35.93
05/07/02  Late Fee       L000000051 05/06/02             .11     1.80
37.84
05/07/02  TOTAL CHOICE   P000000358 05/06/02 06/05/02   2.00    31.99
71.83
05/07/02  Monthly Bill              05/06/02 05/26/02
71.83
05/20/02  MINSVC         P000001853 05/20/02 06/08/02
71.83
05/21/02  LVL1 Disc Adj  P000000358 05/21/02 06/05/02  -1.07   -17.06
```

```
       53.70
       05/21/02  Payment - Check                                          -72.98    -
       19.28
       05/21/02  TOTAL CHOICE   P000000358 05/21/02 06/05/02   1.07     17.06    -
       01.15
       06/07/02  TOTAL CHOICE   P000000358 06/06/02 07/05/02   2.00     31.99
       32.84
       06/07/02  Monthly Bill              06/06/02 06/26/02
       32.84
       07/07/02  Late Fee       L000000051 07/06/02              .10      1.64
       34.58
       07/07/02  TOTAL CHOICE   P000000358 07/06/02 08/05/02   2.00     31.99
       68.57
       07/07/02  Monthly Bill              07/06/02 07/26/02
       68.57
       07/20/02  MINSVC         P000001853 07/20/02 08/08/02
       68.57
       07/21/02  LVL1 Disc Adj  P000000358 07/21/02 08/05/02  -1.07    -17.06
       50.44
       08/01/02  Payment - CCard                                         -68.57    -
       18.13
       08/01/02  TOTAL CHOICE   P000000358 08/01/02 08/05/02    .33      5.33    -
       12.47
       08/07/02  TOTAL CHOICE   P000000358 08/06/02 09/05/02   2.00     31.99
       21.52
       08/07/02  Monthly Bill              08/06/02 08/26/02
       21.52
       09/07/02  Late Fee       L000000051 09/06/02              .07      1.08
       22.67
       09/07/02  TOTAL CHOICE   P000000358 09/06/02 10/05/02   2.00     31.99
       56.66
       09/07/02  Monthly Bill              09/06/02 09/26/02
       56.66
       09/14/02  Payment - CCard                                         -56.66
       0.00
       09/14/02  Waive ChkByPhn F000000015 09/14/02 09/14/02
       0.00
       10/07/02  TOTAL CHOICE   P000000358 10/06/02 11/05/02   2.00     31.99
       33.99
       10/07/02  Monthly Bill              10/06/02 10/26/02
       33.99
       11/07/02  Late Fee       L000000051 11/06/02              .11      1.70
       35.80
       11/07/02  TOTAL CHOICE   P000000358 11/06/02 12/05/02   2.00     31.99
       69.79
       11/07/02  Monthly Bill              11/06/02 11/26/02
```

```
69.79
11/20/02  MINSVC          P000001853 11/20/02 12/09/02
69.79
11/21/02  LVL1 Disc Adj   P000000358 11/21/02 12/05/02  -1.00   -15.99
52.80
11/22/02  Payment - Check                                        -69.79   -
16.99
11/22/02  TOTAL CHOICE    P000000358 11/22/02 12/05/02    .93    14.93   -
01.13
12/07/02  TOTAL CHOICE    P000000358 12/06/02 01/05/03   2.00    31.99
32.86
12/07/02  Monthly Bill               12/06/02 12/26/02
32.86
01/07/03  Late Fee        L000000051 01/06/03              .10     1.64
34.60
01/07/03  TOTAL CHOICE    P000000358 01/06/03 02/05/03   2.00    31.99
68.59
01/07/03  Monthly Bill               01/06/03 01/26/03
68.59
01/12/03  Payment - Check                                        -32.86
35.73
02/07/03  Late Fee        L000000051 02/06/03              .11     1.79
37.63
02/07/03  TOTAL CHOICE    P000000358 02/06/03 03/05/03   2.00    31.99
71.62
02/07/03  Monthly Bill               02/06/03 02/26/03
71.62
02/21/03  LVL1 Disc Adj   P000000358 02/21/03 03/05/03  -0.87   -13.86
56.89
02/21/03  MINSVC          P000001853 02/21/03 03/05/03    .14     2.17
59.20
03/01/03  Payment - Check                                        -68.59   -
09.39
03/01/03  TOTAL CHOICE    P000000358 03/01/03 03/05/03    .33     5.33   -
03.73
03/07/03  TOTAL CHOICE    P000000358 03/06/03 04/05/03   2.00    31.99
30.26
03/07/03  Monthly Bill               03/06/03 03/26/03
30.26
03/26/03  Payment - Check                                        -30.26
0.00
04/07/03  TOTAL CHOICE    P000000358 04/06/03 05/05/03   2.12    33.99
36.11
04/07/03  Monthly Bill               04/06/03 04/26/03
36.11
05/07/03  Late Fee        L000000051 05/06/03              .11     1.81
```

```
38.03
05/07/03  TOTAL CHOICE    P000000358 05/06/03 06/05/03   2.12    33.99
74.14
05/07/03  Monthly Bill               05/06/03 05/26/03
74.14
05/08/03  OneTime EFT Pay                                        -74.14
0.00
05/08/03  STARZ!2         P000002141 05/08/03 06/05/03    .73    11.60
12.33
06/06/03  MESSAGE         B000005075 06/06/03 07/05/03
12.33
06/07/03  STARZ!2         P000002141 06/06/03 07/05/03    .75    12.00
25.08
06/07/03  TOTAL CHOICE    P000000358 06/06/03 07/05/03   2.12    33.99
61.19
06/07/03  Monthly Bill               06/06/03 06/26/03
61.19
06/17/03 *OneTime EFT Pay                                        -61.19
0.00
PAGE BREAK
DTV                       Show Pay-Per-View                       06/20/
03 10:48
 Acct No: 015023909   Name: AARON VOREIS                          Status:
ACTV
                                              Account Balance:
0.00

->
                                           Air            PPV
 Event Code        Description         Date/Time
Amount
PAGE BREAK
```

## AFFIDAVIT OF LI SANG

**BEFORE ME,** the undersigned notary, on this day personally appeared Li Sang, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.  My name is Li Sang. I am capable of making this affidavit. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.  I previously operated and was the custodian of records for a business known as DSS Pro and Smart Card Solutions. That company is no longer operated after being shut down in 2001. Through DSS Pro and Smart Card Solutions, I was involved in the sale of various devices that can be used to intercept DIRECTV's signals, including bootloaders, unloopers, loaders, emulators and programmers. Attached hereto as Exhibit A is a true and correct copy of business records of DSS Pro and Smart Card Solutions reflecting purchase and sale transactions for various individuals who bought devices from my company. Exhibit A was created from each sale transaction through the payment made by the individual and was kept by the company that automatically tracked individual purchases and purchase information once entered on my website by the individual making the purchase. The records were created and maintained on behalf of my company. I downloaded Exhibit A from the company and maintained such records on my computer as business records of DSS Pro and Smart Card Solutions. The records attached in Exhibit A were created at or near the time of the events depicted therein, were kept in the course of a regularly conducted business activity of DSS Pro and Smart Card Solutions, and were made by that regularly conducted activity as a regular practice. Moreover, the records obtained in Exhibit A remained unaltered and unmodified on my computer until being turned over to DIRECTV.

3.  The records reflect the purchase date, the individual's name and address making the purchase, phone number of that individual, a description of the devices purchased, method of payment, and method of shipment.



LI SANG

**EXHIBIT**
**D**

**SUBSCRIBED AND SWORN** to by **LI SANG**, before me, the undersigned authority on this the ___19___ day of February, 2004.

[SEAL]

_____
Notary Public in and for
The State of Indiana

| 7/31/2001 | 18491 | 59.99 | 0 | 12 | 71.99 | Credit Card | Visa-4325159204001097-11-03 | UPS 2nd Day Air (US Orders Only) | Aaron | Vorels | 140 Casa Grande | Brownsville | TX | 78521 | United States | 956.546.9198 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Terminator | | | | | | | aaron@wtsindustrial.com | | Aaron | Vorels | 120 Lomax Road | San Benito | TX | 78586 | United States | |
| Bootloader | 1 | 59.99 | | | | | | | | | | | | | | |

REDACTED



EXHIBIT

DPJP000915 ^Aaron J.^Voreis^120 Lomax Road^ ^San Benito^Texas^78586^
^Shanty Evidence

| | |
|---|---|
| Name | Aaron J. Voreis |
| First Name | Aaron J. |
| Last Name | Voreis |
| Address | 40 Casa Grande |
| City | Brownsville |
| State | Texas |
| Zip | 78521 |
| Country | US |
| Cardnumber | 4325XXXXXXXX1097 |
| Expiration Date | 1103 |
| Message | APPROVED 002545 |
| OrderNumber | W14958920 |
| Email Address | aaron@wtsindustrial.com |
| AVS Message | Y |
| Ship Name | Aaron J. Voreis |
| Ship Address | 120 Lomax Road |
| Ship City | San Benito |
| Ship State | Texas |
| Ship Zip | 78586 |
| Ship Country | N/A |
| Telephone | 956.546.9188 |

Fax                 N/A

Tax                 $12.50

Shipping            $12.00

Total Amount        $164.00

Reference           17V119U895

Date                7/31/2001 1:09:32 AM


Part Number         Part Description
Part Quantity   Part Price
N210SBEMU               Netsignia 210 Shanty Blue PS2 Powered Emulator with
Cable       1               139.5
DPJP000915 ^Aaron J^Voreis^120 Lomax Road^ ^San Benito^TX^78586^ ^Shanty
Evidence


Name                Aaron J Voreis

First Name          Aaron J

Last Name           Voreis

Address             40 Casa Grande

City                Brownsville

State               TX

Zip                 78521

Country             United States

Cardnumber          4325XXXXXXXX9757

Expiration Date     1104

Message             APPROVED 013605

OrderNumber         W96057825

Email Address       aaron@wtsindustrial.com

```
AVS Message          Y

Ship Name            Aaron Voreis

Ship Address         120 Lomax Road

Ship City            San Benito

Ship State           TX

Ship Zip             78586

Ship Country         United States

Telephone            956.546.9188

Fax

Tax                  $0.00

Shipping             $12.00

Total Amount         $161.90

Reference            1BD1Bsk388

Date                 11/13/2001 11:53:46 AM


Part Number          Part Description
Part Quantity   Part Price
ISO3                     ISO 3 in 1Smartcard Programmer and Bootloader
1              89.95

SHANTYBLUEMU             Shanty Blue Powered Emulator Complete w/Cables
1              59.95
DPJP000915 ^AARON J.^VOREIS^120 Lomax Road^ ^San Benito^Texas^78586^
^Shanty Evidence


Name                 AARON J. VOREIS

First Name           AARON J.

Last Name            VOREIS
```

| | |
|---|---|
| Address | 40 CASA GRANDE |
| City | BROWNSVILLE |
| State | TEXAS |
| Zip | 78521 |
| Country | USA |
| Cardnumber | 6011XXXXXXXX8392 |
| Expiration Date | 0203 |
| Message | APPROVED 020699 |
| OrderNumber | W21463510 |
| Email Address | aaron@wtsindustrial.com |
| AVS Message | Address matches Zip does not |
| Ship Name | WTS |
| Ship Address | 120 Lomax Road |
| Ship City | San Benito |
| Ship State | Texas |
| Ship Zip | 78586 |
| Ship Country | USA |
| Telephone | 956.546.9188 |
| Fax | NONE |
| Tax | $17.65 |
| Shipping | $12.00 |
| Total Amount | $243.60 |
| Reference | 2068253781 |

Date                5/20/2001 6:58:00 PM


Part Number          Part Description
Part Quantity    Part Price
EMUPREORDER          Emulator Complete with Cables
1               69.95

SHANTYBL             Shanty Boot Loader Green
1               75
N210                 Netsignia 210 Programmer
1               69
DPJP000915 ^Aaron^Voreis^120 Lomax Road^ ^San Benito^TX^78586^ ^OrderID
16491

RaidAtty             YWC

EvidenceSource       Li Sang

FirstName            Aaron

LastName             Voreis

BusName

ShipStreet           120 Lomax Road

ShipCity             San Benito

ShipState            TX

ShipZip              78586

BillingAddress       40 Casa Grande, Brownsville, TX   78521

email                aaron@wtsindustrial.com

Phone                956.546.9188

Date                 7/31/2001

Item                 Terminator Bootloader

Quantity             1

```
TotalCharge              72

CardNumber               4325159204001097

CardName                 Vi

ShippingCompany/date

ShippingLogNum

HardSoftCopy

IDEU

HardCopyBatesNo

Comments
DPJP000915 ^Aaron^Voreis^40 Casa Grande^ ^Brownsville^TX^78521^ ^Reference
17V11I6535

Date                     7/31/2001

Time                     1:18:07 AM

Evidence Source      Network 1

Ship First           Aaron

Ship Last            Voreis

Ship Name            Aaron Voreis

Ship Address         40 Casa Grande

Ship City            Brownsville

Ship State           TX

Ship Zip             78521

Ship Country         US

Bill Name            Aaron Voreis

Bill Address         40 Casa Grande
```

| | |
|---|---|
| Bill City | Brownsville |
| Bill State | TX |
| Bill Zip | 78521 |
| Bill Country | US |
| Credit Card | 4325XXXXXXXX1097 |
| CC Exp Date | 1103 |
| Message | APPROVED 002515 |
| Order Number | ID-073101011806441 |
| Email Address | aaron@wtsindustrial.com |
| Telephone | N/A |
| Fax | N/A |
| Ship Amount | $0.00 |
| Total Amount | $71.99 |
| Part Number | |
| Part Description | |
| Part Quantity | |
| Part Price | |